MERCHANTS & FARMERS BANK *v.* HARRIS.

Opinion delivered May 11, 1914.

1. FRAUDULENT CONVEYANCES—FAILURE TO ANSWER—PRESUMPTION.—In an action to set aside a fraudulent conveyance, the grantor, individually, will be treated as having admitted the fraud, where he fails to answer. (Page 104.)

2.  FRAUDULENT CONVEYANCES—FAILURE TO MAKE INQUIRY.—The·grantee
    of a person who conveys property with the intent 'to defraud his
    creditors, where the facts and circumstances are sufficient to put
    a man of common sagacity upon inquiry, and where reasonable dili-
    gence would lead him to discover the fraud of the vendor, will be'
    charged with notice of the fraud and held to have assisted the
    vendor in carrying out his fraudulent purposes.   (Page 108.)

3.  FRAUDULENT CONVEYANCES—PARTIES CHARGEABLE—EVIDENCE.—Under
    the evidence, the vendor and vendee of property held to be parties
    and chargeable with fraud in a conveyance made to defraud
    creditors.   (Page 108.)

4.  FRAUDULENT CONVEYANCES—LEVY OF EXECUTION—LIEN.—A lien may
    be fixed by the levy of an execution on lands which have been
    fraudulently conveyed by a debtor, prior to the rendition of the
    judgment against him.   (Page 111.)

5.  FRAUDULENT CONVEYANCES—LEVY OF EXECUTION—LIEN.—A judgment-
    creditor of a vendor who conveyed certain property in order to
    defraud his creditors, acquires a lien on the property conveyed, by
    bringing an action to set aside the conveyance and levying an
    attachment on the land conveyed, and asking that the lien be
    enforced by a sale of the property to satisfy the creditor's judg-
    ment.   (Page 111.)

6.  FRAUDULENT CONVEYANCES—INNOCENT PURCHASER.—The purchaser of
    land upon which a writ of attachment has been levied under the
    *lis pendens* statute (Kirby's Digest, § § 5152 and 5153) is not an
    innocent purchaser for value.   (Page 111.)

7.  FRAUDULENT CONVEYANCES — LIEN—EQUITY — JURISDICTION. — Where
    equity has acquired jurisdiction to set aside a fraudulent convey-
    ance, besides setting the conveyance aside, equity will enforce a
    lien upon the land acquired by the plaintiff creditor by virtue of
    the levy of a writ of attachment upon the land, and will order
    the land sold to satisfy the judgment.   (Page 111.)

8.  EQUITY—JURISDICTION—COMPLETE RELIEF.—The chancery court hav-
    ing assumed jurisdiction for one purpose, will retain it for all and
    grant all the relief, legal or equitable, to which the parties are
    entitled.   (Page 111.)

9.  FRAUDULENT CONVEYANCES—SUBSEQUENT PURCHASERS—RELIEF.—Pur-
    chasers from the grantee in a conveyance made to defraud credit-
    ors, may recover the purchase price from said grantee, where they
    are not parties to the fraud, equity having set the conveyance
    aside, although they had knowledge of the fraud between the origi-
    nal grantor and grantee.   (Page 112.)

Appeal from Clark Chancery Court; *James D. Sha-
ver*, Chancellor; reversed.

*R. G. Harper* and *Patterson & Green,* for appellant.

1.   The deed was fraudulent and void.   22 Ark. 186; 20 Cyc. 439-440-441; 33 Ark. 338; 45 *Id.* 522; 20 Cyc. 446; *Ib.* 447-8; 55 Ark. 582; 14 *Id.* 69; 20 Cyc. 449-452; 50 Ark. 320; 55 *Id.* 579; 58 *Id.* 453; 52 *Id.* 459; 47 *Id.* 301; 20 Cyc. 470-472; 31 Ark. 666; 20 Cyc. 764-5-9.

2.   A person is presumed to intend the necessary and natural consequences of his voluntary acts.   4 Cyc. 419; 68 Ark. 480, 481.

3.   Hahn at least had information to put him on inquiry.   50 Ark. 320; 55 Ark. 579; 58 *Id.* 453; 52 *Id.* 459; 47 Ark. 301; 20 Cyc. 470-472; 31 Ark. 666; 20 Cyc. 764-5-9, 771-2-7-9, 780-1-2-6; *Ib.* 801, 802; Wait, Fraud. Conv., § § 9, 10, 382.

4.   Where the plaintiff has shown strong circumstances of fraud, the burden shifts to the parties to the fraudulent conveyance to explain the circumstances of fraud.   20 Cyc. 453-5; 7 Ark. 269; *Ib.* 197; 20 Cyc. 763-6; 62 Ark. 267.

5.   Harris was insolvent.   Kirby's Digest, § 3313, 6297; 20 Cyc. 757.

6.   Appellant's attachment is a lien which chancery will enforce.   1 Shinn on Attachments, § § 54, 87; 104 Ill. 180; 11 N. J. Eq. (2 Stock), 520; 6 Gray (Mass.) 520; 9 Minn. 108; 13 N. H. 53; Kirby's Dig., § § 349, 360, 5152-3; 67 Ark. 325; 81 Ark. 73; Shinn on Attachments, § § 214, 415, 313, 664; 20 Cyc. 661, 690.

7.   Where a court of chancery has jurisdiction for one purpose, it will afford complete relief.   77 Ark. 576; 74 *Id.* 104; 75 *Id.* 55; 33 *Id.* 328; 23 *Id.* 746.

7.   McMillan and Mrs. Taylor were not innocent purchasers.   Shinn on Att., § § 84, 87.

*McMillan & McMillan,* for appellee.

1.   There was no fraud.   32 Ark. 255; 23 *Id.* 258.

2.   Embarrassment is no proof of fraud.   26 Ark. 23; 41 *Id.* 225; 18 *Id.* 141.

3.   Fraud is never presumed; it must be proven.

4.   The chancellor's findings should be sustained.   4 Crawford's Dig., pp. 150-154; 110 Ark. 367.

*Gaughan & Sifford,* for appellees.

1.   The levy of the attachment created no lien. Kirby's Digest, § 360; 67 Ark. 328; 81 *Id.* 73.

2.   The evidence is not sufficient to prove that Hale was a party to any fraudulent intent on the part of Harris.

WOOD, J.   On the 11th of March, 1911, D. T. Harris sold to G. T. Hale a certain house and lot situated in Arkadelphia, Clark County, Arkansas. Harris and Hale lived at Junction City, in Union County, Arkansas. Hale was the father-in-law of Harris.

On the 17th of March, 1911, the Merchants & Farmers Bank, of Junction City, brought suit against D. F. Harris, in the Union Circuit Court, on a promissory note for $2,500, and caused a general attachment to be issued, directed to the sheriffs of Union and Clark Counties. The sheriff of Clark County, on the 18th day of March, levied on the property in controversy, and filed his certificate of such levy, giving a full description of the property, with the recorder of deeds, in compliance with the provisions of section 5152 of Kirby's Digest. The deed from Harris to Hale to the property in controversy was recorded before the levy of the attachment.

At the October, 1911, term of the Union Circuit Court, the appellant bank obtained judgment against Harris and the attachment was sustained. Between the date of the levy of the attachment and the rendition of the judgment, the property in controversy was sold by Hale to McMillan and by McMillan to Mrs. Taylor.

Appellant then instituted this suit in the chancery court of Clark County to set aside the deeds from Harris to Hale, and from Hale to McMillan, and from McMillan to Mrs. Taylor, alleging that the conveyance from Harris to Hale was fraudulent and void, and that subsequent purchasers had notice of appellant's lien by its attachment.

The appellees, except Harris, answered, denying that the conveyance from Harris to Hale was fraudulent, and setting up that appellees McMillan and Taylor were inno-

cent purchasers, having no notice of the attachment proceedings, and that they paid the value of the land. Appellees McMillan and Taylor filed a cross-complaint with their answer, setting up that McMillan had paid Hale $1,500 for the property, and prayed that in the event the court should set aside and cancel the deed mentioned that McMillan have judgment against Hale for that sum, with interest.

1. The first question presented by the record is one of fact, as to whether or not the deed from Harris to Hale was fraudulent.

Harris himself did not answer the complaint. Therefore, so far as he is individually concerned, the charge of fraud must be taken as admitted; besides, the testimony tending to show that he sold the land in controversy to Hale for the purpose of defrauding creditors is overwhelming.

It could serve no useful purpose to enter into detail in discussing the facts. It suffices to say that Harris was heavily indebted, and that being pressed by his creditors, he conveyed all of his property, of every description, in a short while, to his near relatives and friends, under circumstances which showed clearly that he intended to place his property beyond the reach of creditors, and by these conveyances he rendered himself wholly insolvent.

As to whether or not the appellee Hale participated in the fraudulent purpose of Harris in making the conveyance, the salient facts are as follows: At the time the deed was made, Harris and Hale lived in the same yard. Harris owed Hale more than $1,500. Nevertheless, Hale gave him a check for $1,500 in cash, the agreed price of the land, because he said that Harris was down and out, and he married his baby girl. He might have a settlement with him some time, and might never. He didn't request Harris to pay him at that time because it was almost in the family. He had done that much for all of his children. He didn't however, intend to make a gift to Harris; expected some day to have it all in writing. He didn't say anything to Harris at the time about

letting it apply on his debt, and Harris didn't offer to pay the debt. Hale supposed that Harris was able to pay all his debts. Knew, however, that he was tangled up with the Harris Lumber Company. He knew that Harris was needing some money and thought that to buy the property for $1,500 was a bargain. He had never seen the property. He gave Harris a check on the Citizens Bank for $1,500. At that time he could not say whether he had only about $165 to his credit or not. He had not noticed his account. He did not have any agreement in advance with the bank as to honoring this check for $1,-500. He had never overdrawn before to that amount. He made no arrangements with the bank to cash this check, any more than it was understood that he would overdraw and that his checks would be honored. He didn't pay any interest on the amount. The bank never made any demand on him for any interest.

It was unusual for him to give $1,500 for property he had never seen. The explanation he gives as to why he bought it is as follows: ''I had a daughter that had a boy she wanted to keep in school, and she talked about moving to Arkadelphia where she could keep him in school there and buy some property there. There was some property over in Harrison we had a mortgage on, and we thought maybe we could swap this Arkadelphia property, and we thought my daughter, Mrs. Blackburn, would move there. Mrs. Blackburn and the boy had seen the Arkadelphia property, and I thought I would dispose of the property in that way. I thought I could sell it to Mrs. Blackburn. I expected to turn it over to Mrs. Blackburn and let her make the trade. She went and looked at the property. I think the owner of the house in Arkadelphia went to Harrison and looked at that property, and they hammered around and could not trade. So that stopped that part of it. There was nothing more to that. Then Mrs. Blackburn was trying to buy some other property and move to Arkadelphia, and about that time Harris came to me to sell this, and we made the trade. Mrs. Blackburn was then clear out of the notion, and that left

it on my hands.   *   *   *   I suppose I gave Harris this check in payment for the land when the deed was delivered.  I might have given him the check a day or two before that; I don't remember.  The check paid for the land.  I closed it out with very little negotiations any way.  Thought if I could locate Mrs. Blackburn, that it was a bargain.  Didn't know at the time I bought the property that Harris was financially embarrassed, and that he was selling at a sacrifice.  I was going on what he said.  He said it was a bargain on the land, and that he needed some money, and from what I heard about the property, I thought it ought to be well worth that.  He didn't promise to make good any loss I might sustain.  Didn't have any agreement as to loss.  I kept the property a few months and sold it for $1,500.  I lost interest on my money for several months, unless I got a little rent on it.  Don't think I collected any rents.  No one particularly was looking after the property for me.  McMillan was the man I sold the property to.  I negotiated the sale.  I didn't find it such a bargain as I thought.  I didn't do what I expected.  I bought it whether I was going to make anything or not.  The price I sold for was paid by check payable to me.  I deposited the check in the Citizens Bank; don't remember about what date it was.  I might have consulted Harris about things.  I just had the $1,500 at the Citizens Bank on deposit and got credit for it, and maybe went and drew on it, or it might have been held there for a while.  Don't remember when I received this check; it was a little later than the check I paid for the place with, if I mistake not.''

The testimony of the cashier of the Citizens Bank, of Junction City, was, in substance, to the effect that on March 1, 1911, G. T. Hale, who was a customer of the bank, had a balance to his credit of $165.22, and on March 15, $164.07.  At no time during the month of March did he have as much as $1,500 to his credit.  About $500, or a little over, was the highest balance he ever had during the year 1911.  He had an overdraft of $8.20 which appeared June 9 and continued until November 16.

The cashier didn't remember who presented the check of Hale for $1,500, but Mrs. D. F. Harris, wife of D. F. Harris, was credited with it March 15, 1911. The check was not credited to Harris' account. It was carried as a cash item. The bank occasionally carried checks as cash items. The rule was to charge the drawer, except on special occasions. The special occasion this time that caused the bank to carry it was that Doctor Hale didn't have the money. The check was carried several months before he took it up. The bank got no interest for that time. The $1,500 was subject to check by Mrs. Harris while carried as a cash item. The bank had no agreement that the check should remain in the bank until Doctor Hale took up the $1,500 cash item. There was no collateral security put up by Hale for the $1,500. The cash item was carried from March 15 until August 28, 1911. Then the item was charged to his account and carried as an overdraft until September 12, 1911. The overdraft of $1,500 was paid by his giving the bank a draft for $1,500 that was entered for collection and paid September 12, 1911. No interest was paid on the overdraft. The bank was not necessarily out of the interest as Hale still had an account with the bank. The cashier stated that he carried the $1,500 as a cash item himself. Doctor Hale agreed to take it up in a few days. Six months was a long time to carry an item that way. During the time the cashier had a conversation with Doctor Hale, in which Hale said he was arranging to take up the $1,500 overdraft in the sale of the property. The cashier had no conversation with Harris as to carrying the cash item; the only way he talked to him was about the property. Harris told the cashier that Doctor Hale had a deal on, and if he consummated the deal—the $1,500 was actually placed to Mrs. Harris' credit, and she was free to draw on it. That was the same $1,500 G. T. Hale gave check to Harris for. Hale had done business with the bank for many years. He had been a stockholder since its organization, and the cashier stated that Hale had the confidence of the bank. During the time that the bank

was carrying the check as a cash item, Hale, five or six times, asked about how his credit stood. He asked whether or not any money had been deposited to apply on what he owed for this $1,500 check. He didn't say who he expected to deposit the money to cover the check, or how it was to be paid. Every time he asked about his account, the cashier called his attention to the fact that his account was overdrawn, and that the overdraft did not include the $1,500 check.

Without going into detail in discussing the above facts, *arguendo,* we are of the opinion that they clearly show that the conveyance from Harris to Hale was for the purpose of defrauding Harris's creditors, and that Hale participated in such fraud. But if we are not correct in that, certainly the facts and circumstances were sufficient ''to put a man of common sagacity upon inquiry, and with the use of reasonable diligence, to lead him to the discovery of the fraudulent purpose of the vendor,'' and Hale, having neglected to make inquiry that would have enabled him to discover the fraud, is, charged with notice thereof, and ·must be held to have assisted Harris in carrying out his fraudulent purpose. *Dyer* v. *Taylor,* 50 Ark. 320. The facts bring this case well within the doctrine announced by this court in the above case and numerous other cases. See, *Bryan-Brown Shoe Co.* v. *Block,* 52 Ark. 459; *Adler-Goldman Com. Co.* v. *Hathcock,* 55 Ark. 579; *Rosewater* v. *Schwab Clothing Co.,* 58 Ark. 453.

We are of the opinion that a clear preponderance of the evidence shows that the conveyance was made for the purpose of enabling Harris to appropriate the $1,500 to his own use in fraud of his creditors, and that the facts and circumstances are such as to make Hale a participant in the fraudulent purpose of Harris, or, at least, to make him chargeable with the fraud.

2. The next question is, did the appellant, by its levy on the property in controversy under the order of general attachment, acquire a lien which a court of chancery will enforce against the appellees?

This court, in *Doster* v. *Manistee National Bank,* 67 Ark. 325, held that under the statute giving a judgment-creditor a lien on the real estate ''owned by the defendant in the county in which the judgment is rendered'' (Kirby's Digest, § 5152, 5153), a judgment is not a lien upon land which the judgment-debtor, prior to the rendition of the judgment, had conveyed in fraud of his creditors. In that case the court said: ''Where a debtor has fraudulently conveyed his real estate before any judgment is rendered against him, or has procured same to be fraudulently conveyed to another, he is not in any sense the owner of such real estate, nor is he thereafter seized in law or equity of such real estate, nor is the grantee seized for his use. The authorities generally recognize the fact that a deed to land, although fraudulently conveyed, carries the title of the grantor.''

In that case we further held that a fraudulent conveyance is not void absolutely, but conveys the legal title, subject to the creditor's right to avoid it for fraud.

Section 360 of Kirby's Digest provides that an order of attachment ''binds the defendant's property in the county in which it might be seized under an execution against him from the time of the delivery of the order to the sheriff or other officer.''

The appellees contend that the words ''real estate owned by the defendant'' in the judgment lien statute (Kirby's Digest, § 4438), and the words ''defendant's property'' and ''property of defendant'' in the attachment lien statute are, in legal effect, precisely the same, and that under the doctrine in *Doster* v. *Manistee National Bank, supra,* the appellant acquired no lien by virtue of its attachment because before the issuance of the order of attachment the property in controversy had been conveyed to the appellee Hale.

Conceding the correctness of the contention of the appellees that the language of the above statutes is the same in legal effect it by no means follows that the appellant did not acquire a lien on the property in controversy by virtue of its levy of the writ of attachment. In

*Doster* v. *Manistee National Bank, supra,* while holding that there was no statutory judgment lien on the lands which had been fraudulently conveyed before the rendition of the judgment, we distinctly recognized the rule that a lien might be fixed by the levy of an execution on lands which had been fraudulently conveyed by a debtor prior to the rendition of a judgment against him. On this point, in the *Doster* case, above, we said: "We must discriminate properly · between the statutory judgment lien and the lien acquired by virtue of an execution issued under a general judgment." And, quoted from the Supreme Court of Pennsylvania as follows: "A lien is, indeed, a necessary and inseparable incident of seizure in execution, except where the execution is merely instrumental in enforcing a prior and superior lien by judgment." And from Herman on Executions, p. 265: "Where the judgment is a lien on land, there can be no independent lien acquired by the issue of an execution. But where the land is seized by virtue of a judgment, which is no lien, the execution becomes a lien."

In the later case of *Ward* v *Sturdivant,* 81 Ark 78, this court, with reference to the *Doster* case, said: "One reason for holding that a judgment was not a lien in such case is that where a creditor has obtained judgment, but taken no steps to attack the fraudulent conveyance, or to subject the property conveyed to his judgment, innocent parties might be misled into dealing with such property as the property of the fraudulent grantee, and might be exposed to injury if a judgment was held to be an absolute lien in such cases. But that reason does not apply where the creditor not only recovers a judgment, but levies an execution upon the property and sells it as the property of the fraudulent grantor; for that conclusively shows that the creditor has elected to treat the conveyance as void, and to subject the property to his debt."

In *Ward* v. *Sturdivant, supra,* we held that a judgment-creditor who has levied upon and purchased at an execution sale land fraudulently conveyed by the debtor previous to the rendering of a judgment can recover pos-

session of the land without first going into equity to set aside the fraudulent conveyance. In the recent case of *Sears* v. *Setser*, 162 S. W. 1083, 111 Ark. 11, we reiterated the doctrine of *Doster* v. *Bank*, and *Ward.* v. *Studivant*, *supra,* holding that: "A judgment is not a lien upon land which the judgment-debtor had previously conveyed to defraud his creditors, such conveyances not being void, but only voidable, and there is no lien on it until the levy of an execution on it." These cases, by analogy, rule the present case. Here the appellant not only had its writ of general attachment issued, but had the same levied upon the property in controversy as the property of the appellee Harris. It acquired a lien on the property by virtue of the levy of the attachment, which lien, by analogy to the doctrine of the above cases, it had the right to enforce as against the fraudulent grantee Hale, by treating the property, notwithstanding the fraudulent conveyance, as the property of the vendor Harris. This the appellant has done by this suit to set aside the fraudulent conveyance and asking that the lien be enforced by a sale of the property to satisfy appellant's judgment.

3. Appellees McMillan and Taylor are not innocent purchasers for value. They had notice of the lien acquired by appellant by virtue of the levy of the writ of attachment, under the provisions of the *lis pendens* statute (Kirby's Digest, § § 5152 and 5153), which were fully complied with. The evidence also tends to show that appellee, Mrs. Taylor, had actual notice. See, Shinn on Attachments, § § 54-87.

4. The chancery court having acquired jurisdiction for the purpose of setting aside the fraudulent conveyance, should not only grant the relief prayed for in that respect, but should proceed to enforce the lien by ordering the land in controversy sold to satisfy the judgment in favor of appellant. The chancery court, having assumed jurisdiction for one purpose, will retain it for all and grant all the relief, legal or equitable, to which the parties are entitled. See, *Apperson* v. *Ford*, 23 Ark. 746; *Apperson* v. *Burgett*, 33 Ark. 328; *Cribbs* v. *Walker*, 74

Ark. 104; *Dugan* v. *Kelly,* 75 Ark. 55; *Dickinson* v. *Arkansas City Imp. Co.,* 77 Ark. 576.

5. Appellees McMillan and Taylor, in their cross complaint, prayed for judgment against Hale in the sum of $1,500, provided the deeds were cancelled. We are of the opinion that they are entitled to such relief, and that judgment should be entered for them against appellee Hale in said sum, with interest from the date that same was paid by McMillan to Hale. While McMillan and Mrs. Taylor had notice of appellant's. lien, they did not participate in the fraudulent conveyance, and as against Hale, are entitled to relief.

The court erred in its decree. The same will be reversed, with directions to enter a decree in accordance with this opinion, and for such further proceedings as may be necessary, not inconsistent herewith.