HARDY *v.* HARDY.

5-1415                                    311 S. W. 2d 761

Opinion delivered April 7, 1958.

*Rose, Meek, House, Barron & Nash,* for appellant.

*Frank J. Wills, Quinn Glover, Langston & Walker* and *Wayne Foster,* for appellee.

CARLETON HARRIS, Chief Justice. M e r i w e t h e r Wright Hardy, appellant herein, and Robert L. Hardy, one of the appellees, husband and wife, separated on January 20, 1956. Exactly one month later, appellant instituted suit for divorce in the Pulaski Chancery Court. Hardy filed his answer on March 7th. On March 30th, through a discovery deposition taken from Hardy, appellant learned that on March 6th, Hardy had transferred all of his stocks to his mother, Corinne Hardy, and had also, either on that date or sometime earlier, mortgaged certain personal property. On April 24th, Meriwether Hardy filed a substituted complaint, making Corinne Hardy a party defendant, and alleging that Robert Hardy's business transactions with Corinne Hardy were "fictitious" and entered into for the purpose of defraud-

ing her of her interests in his properties, and asking that "Corinne McCombs Hardy be required to release and permit to be transferred to plaintiff one-third of all personal property belonging to defendant which is now in her custody." Additional grounds for divorce were alleged at the same time. On May 7th, Corinne Hardy filed her answer, denying appellant's allegations. On May 15th, appellant filed an amendment to her substituted complaint alleging that Hardy & Co., Inc.,[1] was a mere dummy, and was being used by Robert Hardy to cheat and hinder her in her efforts to obtain her dower rights. After several other pleadings had been filed by the parties, including a prayer that the court invalidate the pledge held by Corinne Hardy to one-third of the securities (representing the dower interest allowable to appellant), the case, on October 24, 1956, went to trial. After hearing the evidence relative to the divorce, the chancellor, on October 25th, appointed a special master, who was directed to inquire into the various holdings of Robert Hardy . . . stocks and other personal properties . . . realty owned by Hardy . . . rights of appellant in such properties . . . whether the assignments and mortgages from Hardy to his mother were valid . . . the validity of other transactions hereinafter referred to. On November 7th, the court entered its decree granting a divorce to appellant. Subsequent thereto, the master took testimony and filed his report with the court on December 5th, 1956. On December 28th, the court entered its decree adopting most of the conclusions reached by the master, and awarding appellant her statutory rights in both the personal holdings and realty of Robert Hardy, her dower rights in the stocks, however, being subject to a lien held by Mrs. Corinne Hardy. The decree, including land descriptions, covers twenty pages, and only the controverted findings will be hereafter discussed. Appellant's notice of appeal lists twenty decretal orders contained in the decree which are contended to be erroneous, though some of these have now been waived, others are not argued, and

---

[1] Hardy & Co., Inc., was incorporated on February 24th, with a capital of $300.

the balance are covered in six points. Robert Hardy appeals from fourteen decretal orders in the decree, though only four are argued.

*Does the evidence reflect that Robert Hardy and his mother, Corinne Hardy, entered into a scheme to defraud Meriwether Hardy of her statutory rights in Robert Hardy's personal property?*

This is by far the most important question, involving, as it does, approximately $90,000, and is the question given the greatest attention by all parties. The record is voluminous, covering testimony before both the Chancellor and the Master, and discussion here must necessarily be limited. Perhaps it would be well to first discuss the applicable law. In *Merchants and Farmers Bank* v. *Harris,* 113 Ark. 100, 167 S. W. 706, this Court, through Justice WOOD, said:

"Without going into detail in discussing the above facts, *arguendo,* we are of the opinion that they clearly show that the conveyance from Harris to Hale was for the purpose of defrauding Harris's creditors, and that Hale participated in such fraud. But if we are not correct in that, certainly the facts and circumstances were sufficient 'to put a man of common sagacity upon inquiry, and with the use of reasonable diligence, to lead him to the discovery of the fraudulent purpose of the vendor,' and Hale, having neglected to make inquiry that would have enabled him to discover the fraud, is, charged with notice thereof, and must be held to have assisted Harris in carrying out his fraudulent purpose." In the old case of *Singer* v. *Jacobs,* 11 Fed. Rep. 559, tried in the Eastern District of Arkansas, the court went even further, saying:

"An actual agreement or conspiracy between Jacobs and Thompson that the latter would aid the former to defraud his creditors does not have to be shown. It is sufficient to avoid the sale if the facts and circumstances within the knowledge of Thompson are such as fairly to induce the belief that he either knew of the fraudulent purpose of Jacobs, or, having good reason to suspect it, he purposely refused to make inquiry, and

remained wilfully ignorant. A full consideration paid in cash will not protect a purchaser who has notice, actual or constructive, that the vendor is selling to hinder and delay his creditors; * * * ."

We think the law is well expressed in the Maryland case, *Oles Envelope Corporation* v. *Oles*, 193 Md. 79, 65 Atl. 2d 899.

"There is unquestionably a difference between the claim of a wife upon her husband's estate, and the claim of a wronged wife, who because of the misconduct of her husband becomes entitled to a divorce and has applied or is about to apply for alimony. * * *

A husband has the right to make a transfer of his property, either with or without consideration, even though he strips himself of all means of supporting his wife, and leaves her without the means of subsistence, provided that he does so in good faith and without intention of defrauding her of her just claims upon him and his estate. * * *

On the other hand, a conveyance made by a husband before and in anticipation of his wife's suit for alimony, or pending such suit, or after a decree has been entered therein in the wife's favor, to prevent her from obtaining alimony, is fraudulent and may be set aside, unless the grantee took in good faith, without notice and for value. *The grantee's knowledge of or participation in the fraud of the grantor must be gathered from the various facts composing the transaction and all the surrounding circumstances.*[2] * * *"

In determining whether the facts in this case are such as to come within the cases cited, we deem it appropriate to review the sequence of events.

January 20, 1956—Robert Hardy and wife, Meriwether Hardy, separated.

February 20, 1956—Divorce suit filed by Meriwether Hardy.

---
[2] Emphasis supplied.

February 24, 1956—Hardy & Company was incorporated.

March 1, 1956—Appellee was at the Mayflower Hotel in Washington, D. C.

March 1, 1956—Corinne Hardy, mother of Robert, wrote to appellee saying she would advance up to $850,000 to Hardy & Co.

March 4, 1956—Robert Hardy arrived in Little Rock.

March 6, 1956—Chattel mortgages from Hardy to mother were signed.

Note, in the amount of $11,000, bearing date of December 9, 1955, executed between Hardy & Co. and Corinne Hardy, which appellant contends was not executed, or at least not collateralized, until March 6, 1956. There is apparent merit in this contention since the typing of the description of the securities pledged extends in part over the signature of Hardy, showing that the pledging of securities was written in after the note had been signed. The same is true of a note in the amount of $50,000, dated December 30, 1955, and the evidence reflects that Hardy was in Oregon on December 30th.

March 7, 1956—Answer to appellant's complaint filed by Robert Hardy.

April 24, 1956—Substituted complaint filed by Meriwether Hardy asking that Corinne Hardy be made a party defendant, alleging that Corinne Hardy and her son had entered into certain agreements designed to deprive appellant of her dower rights, asking that Corinne Hardy be required to release, for transfer to appellant, one-third of all personal property belonging to Robert Hardy and held by her, and asking that the mother be restrained from further encumbering the personal property belonging to her son.

May 7, 1956—Corinne Hardy filed her answer denying she had entered into any arrangement with Robert devised for the purpose of depriving appellant of her dower rights, and asserting that she had entered into no

contracts with her son since learning of the divorce action.

May 15, 1956—Meriwether Hardy amended her substituted complaint asking that Hardy and Company be made a party defendant, and praying lien upon the assets of such company if the original prayer against Corinne Hardy not be granted.

Other pleadings were filed, but are not particularly pertinent to a discussion of this issue.

The testimony relating to Hardy's holdings and various transactions was, in some instances, noteworthy for incongruity and lack of candor, and denoted such a departure from ordinary business procedure as to be almost unbelievable. One cannot read the testimony of Robert Hardy without observing that he was most evasive, either suffering from poor memory or unwilling to account for various expenditures. A good example is furnished by Hardy's transactions with Marcus A. Brandjord and R. L. Adams, employees of Hardy & Company. Hardy was served with summons in the divorce suit on either February 20th or 21st. On February 21st, the evidence reflects that Hardy gave Brandjord a check in the amount of $6,000, made payable to Brandjord. Brandjord endorsed the check and returned it to Hardy later in the day. Hardy cashed it. The same procedure was followed with Adams.

Hardy's testimony relating to the transaction was as follows:

"Q. You did not place the $6,000 with either one of them, but you took the money?

A. That is right. When they would take a trip or they had call for it, I would let them use it.

Q. You didn't put the money back in the bank, did you?

A. No, I don't believe I did. I could have put some of it back. I don't remember.

\* \* \*

A.  It was for when the banks were not open, holidays when we had to travel, if our credit was questioned.  We were a new corporation.  Cash would be much better than a check or anything else, so—

Q.  But you handed the check, made payable to Brandjord, to him, and he endorsed it, and then you took it down to the bank and got the money, didn't you?

A.  Yes, that is correct.

Q.  And what was the object in using Brandjord's name?

A.  Well, why not?

Q.  Why didn't you just make the check to cash and cash it at the bank?

A.  I don't remember what the reason was.  I just did.''

This explanation seems rather ''shallow,'' and leaves us unconvinced.

On May 15, Hardy drew $25,000 from the corporation without consulting any of his associates . . . there was no resolution by the board of directors authorizing the money to be taken from corporate funds . . . no vouchers showing what the money was to be used for.  The evidence reflects that $18,000 was redeposited shortly, but $7,000 was not satisfactorily accounted for.  The handling of this amount of money seems quite unorthodox.  From Hardy's testimony:

''Q.  What did you do with the $25,000 you withdrew from Hardy & Company?

A.  I put it back in the bank at various times, and used it for Hardy & Company in various ways.

Q.  Where did you keep it while you had it before you put it back in the bank at various times?

A.  Where did I keep it.  I kept it in the safe.  I could keep it in a lock box.

Q. Do you mean to tell this court you took $25,000 out of Hardy & Co., Inc., and put it in a lock box somewhere?

A. I could put it in another account. I can't remember back that far. You know we got into that once before.

\* \* \*

Q. You don't know whether you put it in cash or put it in another bank?

A. No, sir.

Q. Why did you take it out?

A. I had a good reason for it at the time.

\* \* \*

Q. Now the date is May 15th. Will you tell us now why you withdrew it?

A. May, 15th?

The Master: Just say you can or cannot.

The Witness: I just told him I could not remember.''
These instances are illustrative of a course of conduct, hereinafter more fully discussed in conjunction with the acts of the mother, which convinces us that Hardy had every intention of hiding his assets; that Hardy & Co. funds were considered by Hardy as available for his personal use, and that his primary purpose was to prevent his wife from acquiring her statutory rights in his properties.

What are the circumstances relative to whether the mother, Mrs. Corinne Hardy, participated in the scheme with Robert? Let it first be said, as argued by appellee, that there is no doubt but that as far back as 1954, the Hardys had contemplated building a hardboard manufacturing plant. It does appear, however, that the original plan contemplated the participation of the entire family in the venture. In a letter dated February 9, 1955, the attorney for Mrs. Hardy wrote a St. Louis bank that ''The Hardy family is considering entering into

a business venture * * *. You doubtless are familiar with some of the securities and property Miss Hope Hardy owns, but Mrs. Hardy doubts if you have any specific information about her personal holdings or the personal holdings of her son, Robert.'' The fact that such a project had been previously contemplated is not disputed by appellant, but it is argued that, subsequent to the filing of the divorce, the original plan was changed, *i. e.*, instead of the construction and operation of such plant being a family venture, it suddenly became the venture of Robert Hardy. It is argued that everything Hardy owned was pledged to his mother in an effort to remove said properties from the reach of his wife. We will have to say that it does appear he pledged or mortgaged substantially all assets. For instance, after having pledged all of his securities, he proceeded, on March 6th, to mortgage a Buick,[3] Cadillac, and Dodge 2-ton truck. Another mortgage of the same date included a Chris-Craft motor boat, a riding horse, horse trailer,[4] bridles, saddles, furniture, furnishings, kitchen and household appliances, silverware, dishes, glassware, and all other household effects. It is difficult to see the necessity of mortgaging household appliances, dishes, etc., as this could not have added a great deal as security for $850,000, and actually, this occurrence lends considerable momentum to appellant's argument — and influences us to no small degree. The Master found that the mortgage on these ''chips and whetstones (so characterized by the Master in comparison to the debt secured) is not natural nor normal, and leads to the conviction that the mortgages were not given as security. I find that the mortgages are not encumbrances on plaintiff's portion of the described property. * * *'' This holding was adopted by the trial court, and we fully agree. The Master, however, and court, found that the delivery of the securities, on the same

---

[3] The Master and Chancellor awarded appellant the Buick.

[4] The horse and horse trailer were awarded appellant. At the time the horse was given to her, Hardy gave her a note which said: "Happy Birthday. Bought you Bayon. Love, Animal." He contended this was not a valid gift because he had signed it "Animal" instead of using his name.

date, was entirely *bona fide*. Though in holding the mortgages invalid, the Master made no finding that same were executed with the intent of defrauding appellant of her dower, it seems clear that such a conclusion would necessarily follow. The mortgages were given for some purpose — if not for security, then for some other reason — and no other reason has been advanced except the obvious one. It appears, therefore, that Robert Hardy and his mother had the intent to place the properties mentioned in the mortgages beyond the reach of appellant. Since it is concluded that such a thought was in their minds concerning lesser properties, it seems illogical to conclude that no such thought entered their minds in pledging major properties.

The speed with which the transaction was handled following the filing of the divorce action is potent evidence in behalf of appellant. Though the plant had been contemplated for at least a year, the essential and necessary steps in organizing the corporation and in financing the construction of same, including the pledges and mortgages given by Robert Hardy, took place in a period of less than two weeks — all subsequent to the filing of the divorce complaint.

Mrs. Hardy filed an answer stating "that she has entered into no contracts with her son since she learned of the filing of the divorce herein." Appellant testified that Corinne Hardy formerly called her every day, but, as of the time of the separation in January, the mother ceased calling, and Meriwether Hardy heard no more from her after that date. We think this significant, though it, of course, standing alone, establishes nothing. It does strain credulity to believe that this son, though apparently very close to his mother, would not have mentioned to her that his wife had filed suit for a divorce, the evidence reflecting that they had conversed together over long distance subsequent to the filing of the divorce complaint, and before his return to Little Rock on March 4th. It also seems that in taking a chattel mortgage on wedding presents and household goods, a mother-in-law, normally, if acting in good faith, would make some inquiry as to the possible reaction of her

daughter-in-law. At any rate, it is clear that additional security was sought to be taken after the litigation was well under way. Hardy is the owner of valuable lands, and according to his testimony, learned (during the taking of his discovery deposition on March 30th by appellant's attorney) that he could mortgage these lands, subject to his wife's dower interest. Mrs. Hardy was informed of this fact, and on March 31st wrote a letter to Robert asking that these lands be mortgaged to her as additional security. On the same date, he advised her by mail that he was willing to do so. The formality of letter writing between mother and son in regard to the mortgage, indicates that the letters were exchanged for the purpose of getting this agreement "on record," particularly since both letters were written on the same date. The record does not reflect that this mortgage was ever given, though it might be argued that the agreement constituted an equitable mortgage. If an equitable mortgage is effectuated by the agreement, appellant, of course, would be unable to collect a money judgment against Hardy through execution. An opposite fact, to us, which relates to whether Mrs. Hardy had knowledge of the divorce action, was her failure to testify at any time during the trial. It is apparent that some of the transactions herein mentioned required an explanation. If these transactions were entirely *bona fide,* it would appear that Mrs. Hardy would have presented her testimony to the court, relating pertinent facts concerning events dating from the inception of the plan to construct the plant . . . the original participants . . . when Mrs. Hardy elected not to participate . . . why it was decided that Robert would be the only member of the family engaged in the business . . . when it was determined that Robert should pledge his securities as collateral . . . why a mortgage was taken on all personal belongings and household equipment . . . the necessity for the agreement to give the real estate mortgage . . . when she learned of the separation . . . of the filing of the divorce complaint . . . the reason for suddenly terminating her daily conversations with appellant. No reason is shown

as to why Mrs. Hardy did not testify, and under the circumstances, we feel that such failure raises a presumption that she felt the various transactions could not be sustained under a vigorous and searching cross examination. It is concluded that the proof meets the requirements set out in the cases heretofore cited, and the answer to the question asked at the beginning of this discussion is "Yes."

*The Rice-Hardy Partnership.* In October, 1955, Hardy entered into a contract with one Jack Rice, whereby they purchased some rural property. Hardy paid $6,000, and assumed a mortgage in the amount of $7,000. It was agreed between Rice and Hardy that when the property was sold, any amount in excess of $13,000 would be divided equally between them. Rice located a purchaser in the summer of 1956, who offered $21,000 for the property.[5] Corinne Hardy issued her check, dated April 4, 1956, in the amount of $6,000 to her son, and assumed the mortgage. Appellant contends that this was but another phase of appellees' determination to conceal all of the assets of Robert Hardy, and that she is entitled to one-third of Hardy's part of the profit. The check was cashed on August 16th, and Hardy gave no reasonable explanation of why he waited so long to cash it. It is immaterial, however, as to whether the check was given in April or August, since both occurred sometime after the filing of the divorce complaint. While this transaction, particularly viewed along with those already mentioned, has a suspicious appearance, we are unable to say that the chancellor's holding was contrary to the weight of the evidence; and appellant's claim is denied.

*Appellant Was Entitled To Expenses Incurred in the Taking of Depositions.* Numerous depositions and discovery depositions were taken, at the cost of $1,356. The court found:

"The claim of plaintiff for $1,356 for depositions and for the services of out of town attorneys is denied for the reason that prior to the incurring of such ex-

---

[5] As of the time of the trial, the sale had not been completed.

pense the defendant offered not to contest a decree for divorce on the ground of indignities to the person of plaintiff."

It is admitted that Hardy did so agree, but appellant alleged that Hardy had also agreed she should have the dower rights to which she was entitled under Arkansas law; that she learned he was disposing of his property and encumbering same, and that his promise was not made in good faith. We think Meriwether Hardy was entitled to present her proof, and the depositions were helpful to her cause. We feel that the court was entitled to the knowledge of Hardy's conduct as an aid in determining questions of alimony and proper orders for child custody; furthermore, part of the contents of the depositions related to the use of corporate funds by Hardy, and other matters relating to his finances. Since the depositions were pertinent to the issues involved, it follows that the court erred in not allowing this claim for reimbursement.

*The Euclid Smith Transaction.* Hardy testified before the Master that Dr. Euclid Smith owed him $10,000, and on this testimony, the Master gave appellant a one-third interest in said debt. Later, both Hardy and Dr. Smith contended that the debt had been paid. Hardy's testimony relative to the transaction is rather evasive and unsatisfactory. Dr. Smith did not remember the date of repayment, but stated he made two payments of $5,000, each in cash, at the Albert Pike Hotel. Under the advice of his attorney, he refused to state where he had obtained the cash, or the reason for borrowing the money from Hardy. The chancellor held that the debt had not been repaid, and we are unable to say such finding is erroneous. However, the trial court rendered a cash judgment against Robert Hardy for $3,333.33 (representing one-third of the debt), and this was error; having found that the debt had not been paid, the court only had the right to give appellant a one-third interest in same.

Other points are raised by both appellant and appellees, and two of appellant's points will be hereafter

discussed under the heading, "Summary." A discussion of the others would unduly prolong the opinion, and serve no good purpose. We have carefully considered each point not herein discussed, and find no merit in same.

## SUMMARY

Robert Hardy had personal properties of the value of nearly $300,000 at the time this lawsuit was filed. At the time the decree was rendered, his unpledged assets had diminished to the point that his wife only received absolutely, approximately $4,500, clear of any pledge. As stated, we have concluded that Hardy and his mother entered into a scheme to deprive appellant of her statutory rights in Hardy's properties. Unquestionably the hardboard manufacturing plant had been considered for some time before the separation of Hardy and his wife, and the project itself was completely *bona fide*. The evidence reflects that the full $850,000 went into the project. It does seem odd that Mrs. Hardy, at the outset, did not require a mortgage from Hardy & Co., securing advances made and to be made, immediately upon the company's acquiring the plant site (though advised to do so by her attorney). This had not been done at the time of the trial, though the master held that the company's promise to do so constituted an equitable mortgage. We are convinced that the original plan was changed and subsequently developed in a manner to prevent appellant from acquiring her dower. In other words, it was a matter of "killing two birds with one stone."

The decree is reversed and remanded with the following directions:

1. As to the stocks and bonds, appellant should be awarded her dower in these securities, free of any claim of Corinne Hardy. It may well be that these securities have been pledged by the mother to innocent third parties as security for some portion of the amount advanced by her to Hardy & Co. In such event, appellant should be given judgment against Robert L. Hardy for the full

amount of her dower and permitted to enforce same by execution against Hardy's lands. As far as the record shows, no mortgage had been given by Hardy to his mother on these lands at the time of the decree. Only the letter had been written agreeing to mortgage same. We are not presently concerned with whether the agreement constitutes an equitable mortgage between the two appellees, but if the securities are now beyond the reach of appellant, her right to levy on the lands is paramount to any claim by Corinne Hardy. Under these findings, it is not necessary to discuss appellant's right to a lien against the assets of Hardy & Company. This is a matter that would be properly heard by the court if the real estate is also presently encumbered so that Meriwether Hardy would be unable to enforce her judgment by execution. It follows that appellant is not presently, under these findings, entitled to any stock in Hardy & Company.

2. Item 18 of the decree (disallowing appellant's claim for costs of depositions and out-of-town attorneys) is reversed, and the chancellor directed to allow this item.

3. Appellant's attorneys were awarded a fee of $2,000, which is considered inadequate, particularly under the result we have reached. Appellant's attorneys will be awarded an additional fee of $3,000 or a total of $5,000.

4. Appellant is awarded a one-third interest in the Euclid Smith indebtedness.

5. The order allowing appellant $262.50 per month for temporary alimony shall remain in effect until such time as appellant's award of dower, herein set out, shall be satisfied in full.

In all other respects, the decree is affirmed.

GEORGE ROSE SMITH, J., not participating.