James R. WEBER *v.* Mildred Anne WEBER

74-3                                    508 S.W. 2d 725

Opinion delivered May 13, 1974

Laser, Sharp, Haley, Young & Boswell, P.A., for appellant.

Jack L. Lessenberry, for appellee.

JOHN A. FOGLEMAN, Justice. Mildred Anne Weber and Dr. James R. Weber were married October 3, 1964, in Jacksonville, Arkansas, where James Weber engaged in the general practice of medicine. They have one child, Dana Elizabeth, now aged eight years. On January 31, 1973, Mrs. Weber filed suit for divorce, alleging indignities to her person as grounds. She specified abuse, ridicule and neglect as elements of the charge. She asked for alimony, property distribution and custody of the child. Dr. Weber filed an answer denying Mrs. Weber's allegations, counterclaimed for divorce on the same grounds and also sought custody of the minor child. On July 8, 1973, the chancellor granted Mrs. Weber's prayer for divorce, awarded custody of the minor child to the mother and awarded alimony and child support. For reversal, appellant contends that the decree granting the divorce and dismissing his counterclaim was against the preponderance of the evidence. We do not agree and affirm the decree.

The burden was upon appellant to demonstrate error in the chancellor's findings. *Hendrix v. Hendrix,* 256 Ark. 289, 506 S.W. 2d 848 (1974); *Holt v. Holt,* 253 Ark. 456, 486 S.W. 2d 688; *City of Little Rock v. Sunray DX Oil Co.,* 244 Ark. 528, 425 S.W. 2d 722. We will not reverse them unless they are clearly against the preponderance of the evidence. *Hampton v. Hampton,* 245 Ark. 579, 433 S.W. 2d 149; *Hendrix v. Hendrix,* supra; *Williams v. Campbell,* 254 Ark. 592, 495 S.W. 2d 512; *Marine Mart v. Pearce,* 252 Ark. 601, 480 S.W. 2d 133. Where, as here, there are sharp conflicts in the testimony which must be resolved, to a considerable extent, upon evaluation of the credibility of witnesses, we must defer to the judgment of the trial judge because of the superiority of his position in making that determination. *Green v. Owens,* 254 Ark. 574, 495 S.W. 2d 166; *Marine Mart v. Pearce,* supra;

*Dodds* v. *Dodds*, 246 Ark. 313, 438 S.W. 2d 54; *Hampton* v. *Hampton*, supra.

The evidence presented in behalf of appellee related to alleged incidents of physical abuse, appellant's association with one of his nurses, allegedly false accusations of appellee made by Dr. Weber, and conduct on his part which was embarrassing to Mrs. Weber. Appellant contends that the testimony showed nothing more than incompatibility, that it was not sufficiently corroborated and that any misconduct on his part had been condoned by appellee. We do not agree with any of these contentions. We state the testimony, insofar as plausible, in generalities, endeavoring to avoid details, because we feel that the best interests of the parties and their young daughter, whose custody is involved, require no more. Mrs. Weber told of two instances when violent conduct on the part of Dr. Weber caused her to flee to homes of neighbors. On the later occasion she said that he inflicted bruises and that he subsequently came to the neighbor's home and pursued the quarrel. The most critical incident in the breakup of the marriage occurred in October 1972, when a 20-year-old nephew and Mrs. Weber were visiting and Dr. Weber, having left the house after dinner, returned about 10:30 and found Mrs. Weber and her nephew alone together. The versions of the witnesses as to what had occurred are sharply conflicting. Her version was that the doctor was intoxicated, made unfounded accusations, threatened to kill her, the nephew and her brother, the nephew's father, and administered a severe beating over a period she estimated to be 20 or 30 minutes, and then left the house. She said there were other instances when Dr. Weber inflicted physical violence upon her. According to her, Dr. Weber had consulted a psychiatrist after the first incident. She related that about the time of the final separation, January 23, Dr. Weber told her, after they had left a conference with his attorney at which she had refused to sign a settlement proposal made by the doctor, that he would kill her if she tried to see her brother or an attorney. She told of having seen her automobile, then being driven by her husband, parked after midnight, on two occasions, at the home of a nurse employed by him. She claimed to have met the two when they were returning in a motor vehicle from a farm in which Dr. Weber was interested and said that they were sitting unusually close together.

We deem this testimony, viewed as a whole, sufficient to constitute the grounds for divorce alleged by appellee, if her testimony was believed. The corroboration need be only slight in this case, because no one could ever assert that this bitterly contested case was collusive. *Lewis* v. *Lewis*, 255 Ark. 583, 502 S.W. 2d 505 (1973); *Morlan* v. *Morlan*, 255 Ark. 799, 502 S.W. 2d 628 (1973).

Mrs. Weber's brother recalled a telephone call by the doctor in October 1972, threatening to kill both the brother and his son and accusing Mrs. Weber and her nephew of misconduct. He described his sister's appearance when he saw her five or six days later as shocking, because of the extent and number of bruises about her body. Dr. Ernest Harper recalled examining Mrs. Weber about this time and finding numerous bruises. A lady who attended a therapy group with Mrs. Weber recalled seeing her with a black eye and bruised face in October 1972. Dr. Weber admitted having struck Mrs. Weber and inflicting bruises, but said that it was done in anger attributable to his surprising appellee and her nephew in shocking misconduct. He denied beating her. Another witness, formerly employed by Dr. Weber stated that the doctor had said his wife had been guilty of adultery. Dr. Weber admitted he had accused his wife of adultery on the basis of suspicion only.

On the occasion of a Christmas visit in 1970, Mrs. Weber's mother recalled having seen bruises about her daughter's face and arm, which appellee said were inflicted by appellant. This witness said her daughter expressed her fear of her husband on this occasion. The mother said that, in her presence, Dr. Weber generally treated his wife in a very degrading, condescending, brutal manner, and she gave illustrative instances. This, according to the witness, was very embarrassing, both to her and her daughter. Appellee's father also observed his daughter's black eye about Christmas 1970. He testified he had noticed a strained marriage relationship over a two-year period. He thought Dr. Weber was too harsh with appellee and too demanding of her. There was also substantial corroboration by the neighbor to whose home Mrs. Weber went on her second flight.

While appellant points out conflicts in the testimony on behalf of appellee, and argues forcefully about the credibility

and weight which should be accorded it, we are in no position to say the chancellor erred in these matters.

Appellant contends his misconduct was condoned. Condonation seems to have been first asserted by him in his brief on appeal. We find no intimation that appellant was relying on this defense in the trial court. Be that as it may, we do not find that there was a condonation as a matter of law. Appellant relies upon appellee's admission that the two might have slept together once or twice after her having been beaten by Dr. Weber in October of 1972. This could, of course, constitute evidence of condonation. But standing alone, it is not enough. An act of sexual intercourse after an act of cruelty is evidence of condonation, but is not conclusive unless wholly voluntary on the part of the injured spouse. *Buck* v. *Buck*, 205 Ark. 918, 171 S.W. 2d 939. Continued cohabitation will condone acts of cruelty, but there are exceptions where the life or health of the innocent party is involved, or where cohabitation is continued in the hope of better treatment. *Shirey* v. *Shirey*, 87 Ark. 175, 112 S.W. 369. The rule is somewhat relaxed when the wife is the innocent party because of the greater difficulty of her withdrawal from the marital domicile attributable to her greater dependence upon the husband for protection and support. *Shirey* v. *Shirey*, supra. We refused to apply the rule when the wife testified that her living with her husband as man and wife after a separation was not due to a reconciliation but for the purpose of obtaining the custody of her child. *Greer* v. *Greer*, 193 Ark. 301, 99 S.W. 2d 248. If the testimony of Mrs. Weber is believed, and it is obvious the chancellor did believe it, we would not be justified in reversing this decree on the ground of condonation.

Mrs. Weber testified she remained in bed all the next day after the October 1972 beating. She said she then discovered that her car keys were missing, so she remained in bed several days before going to see Dr. Harper, because she knew she had to wait until her husband left on a planned trip to California. She stated she consulted an attorney on the same day she saw Dr. Harper, but did not advise Dr. Weber of her seeking legal assistance because he had threatened to kill her if she did. When Dr. Weber came back from California, he returned to the residence where the parties had lived,

but not to their bedroom, according to Mrs. Weber. She said he slept in a back room, that their relationship was very strained and that she tried to stay out of his way and to avoid their sleeping together. She justified her remaining in the home and the occasions when the two slept together by stating her desire to wait until after Christmas to separate in the interest of her daughter. She said that over a two-year period she had been afraid to leave Dr. Weber because of her fear that he would hurt her if she did. The actual separation did not take place until January 23, 1973. She explained that Dr. Weber had already taken an apartment, but told her that he would not move out until she signed some papers "about a divorce."

Dr. Weber's own testimony falls far short of establishing condonation, and is somewhat corroborative of Mrs. Weber. He testified that, at Mrs. Weber's request, he moved out with the feeling that his marriage was completely dead, and that he thought in retrospect that it had been for a year or two. He also testified that his wife had lost all interest in sex with him and estimated that the parties engaged in sexual intercourse not more than three or four times during all of 1972, and asserted that he had slept in the guest bedroom all that year. He said he chose to remain at home that year, principally on account of his daughter. He knew, when he came back to the house after the episode involving Mrs. Weber's nephew, that divorce was inevitable. He had not intended to move out, even after he and she had gone to his attorney's office, but did so on the advice of counsel one week before appellee filed suit for divorce.

Appellant also invokes the doctrine of recrimination. A factor to be considered in deciding whether it is to be applied is the apparent lack of possibility of reconciliation. *Ayers* v. *Ayers,* 226 Ark. 394, 290 S.W. 2d 24. That possibility seems totally absent here. Where both parties are at fault, it is appropriate that relief be granted against the greater and first offender. *Longinotti* v. *Longinotti*, 169 Ark. 1001, 277 S.W. 41. See also, *Hensley* v. *Hensley*, 213 Ark. 755, 212 S.W. 2d 551. This is sometimes referred to as the doctrine of comparative rectitude. See *Lewis* v. *Lewis*, 248 Ark. 621, 453 S.W. 2d 22. Even though we feel that Mrs. Weber should bear some share of the blame for the wrecking of this marriage, the matter of credibility is again important. If her testimony, and that on

her behalf, are given full credit, and that by and on behalf of Dr. Weber is not, then she was entitled to a divorce, at least on the basis of comparative rectitude. A divorce should be denied upon the basis of recrimination only when it is found that the fault of the parties is equal in degree, so that neither is in position to demand the interposition of the court. *Lewis v. Lewis,* supra. Another factor to be considered in determining whether a divorce should be denied upon the ground of recrimination is the potential effect of further cohabitation upon the safety of either of the parties. See *Healy v. Healy,* 77 Ark. 94, 90 S.W. 845; *Cate v. Cate,* 53 Ark. 484, 14 S.W. 675. Since there seems to be general agreement that this marriage is beyond redemption and there is evidence which would justify a belief that further cohabitation might well be hazardous to appellee's health and safety, there was no error in failing to apply the doctrine of recrimination.

Appellant also contends that dismissal of his counterclaim for divorce and custody of his daughter was error. Dr. Weber testified he and his wife had a relatively happy, stable marriage until two or three years previous to the trial, when Mrs. Weber underwent a personality change. He said she became extremely irritable and argumentative, given to temper flareups, neglectful of housekeeping and meal cooking, extravagant about spending on credit, inappropriately hostile, extremely forgetful and paranoid. He stated that she not only accused him of wanting to kill her but of many illicit affairs. He related that her living routine changed in that she often would stay up all night and then sleep until noon or, sometimes, all day. He told of occasions when she assaulted or threatened him. According to him, she had kept company with other men. Dr. Weber's version of the incident in October 1972 would have justified indignation on his part, if his version was accepted as correct. There was some corroboration of Dr. Weber's testimony, which, if accepted at face value, would probably have been sufficient to have justified the granting of a divorce to him. Appellee, however, offered testimony tending to contradict much of the corroborating evidence. Although we cannot say that Mrs. Weber was without fault, we cannot say that a finding that Dr. Weber was more to blame was clearly against the preponderance of the evidence.

The major thrust of Dr. Weber's contention on the

counterclaim, however, is directed toward the matter of custody of the child of the parents. There is convincing evidence from which it would be fair to conclude that both parents have a genuine love for their daughter, which is reciprocal. So long as the best welfare of the child does not otherwise require, there is a decidedly humanitarian preference for placing a child or tender years, particularly a daughter, in the custody of the mother. *Townsend* v. *Lowery*, 238 Ark. 388, 382 S.W. 2d 1; *Wimberly* v. *Wimberly*, 202 Ark. 461, 151 S.W. 2d 87; *Andrews* v. *Andrews*, 117 Ark. 90, 173 S.W. 850; *Roberts* v. *Roberts*, 216 Ark. 453, 226 S.W. 2d 579; *Taylor* v. *Taylor*, 163 Ark. 229, 259 S.W. 395; *Gibson* v. *Gibson*, 156 Ark. 30, 245 S.W. 32. Even infidelity may not constitute sufficient grounds for denying a mother the privilege of bringing up her child. *Gilbert* v. *Swilley*, 235 Ark. 974, 363 S.W. 2d 412; *Aucoin* v. *Aucoin*, 211 Ark. 205, 200 S.W. 2d 316. The chancellor's findings on this must also be affirmed unless clearly against the preponderance of the evidence. *Stephenson* v. *Stephenson*, 237 Ark. 724, 375 S.W. 2d 659. There is no case in which the opportunity of the chancellor to observe the parties is accorded more weight. *Holt* v. *Taylor*, 242 Ark. 292, 413 S.W. 2d 52; *Cheek* v. *Cheek*, 232 Ark. 1, 334 S.W. 669. In order for us to overturn the award of the custody of this young daughter to her mother, we must find that Mrs. Weber's unfitness as a mother was established by a clear preponderance of the evidence. See *Cassell* v. *Cassell*, 211 Ark. 489, 200 S.W. 2d 965. This we cannot do.

It should be noted that appellant once agreed that his wife might have custody of the daughter, but changed his mind. His change of mind, according to him, resulted from investigations he made after the divorce suit was filed, through which he discovered that Mrs. Weber had been taking an inordinate amount of prescription drugs. Many of these drugs were prescribed by different physicians, apparently without any of them knowing what the others may have prescribed. Dr. Weber now is of the opinion that this indiscriminate use of drugs by Mrs. Weber was the real cause of her changes in attitude, personality and conduct. Mrs. Weber described some of them as diuretics, sleeping pills, anti-depressants, diet depressants, antihistamines, cortisone skin creams, antibiotics and kidney medicines. She admitted having obtained some of them from drug salesmen, but said that she did so at the suggestion of her husband so that he

might be spared the trouble of asking for them. Dr. Weber offered evidence that she had also taken drugs which were samples kept rather insecurely in his office. Dr. Weber said that some of the drugs she was taking could cause permanent mental deterioration and any might occasionally cause toxic psychosis resulting in loss of touch with reality, paranoia and hallucinations. He feared the dangers of withdrawal reactions, such as convulsions and the potential dangers when mixed with alcohol. The withdrawal reactions could be helped by psychiatrists, according to Dr. Weber.

A medical expert called by appellant identified the various drugs disclosed by pharmacy records to have been furnished to Mrs. Weber. Three of them he identified as "scheduled" drugs, each prescribed by a different physician. All were potentially addictive. One taking either of two of them should be restricted as to activities, such as driving an automobile. He described potential effects similar to those stated by Dr. Weber, and mentioned possible synergistic reaction with alcohol, and of one drug with another. He said that different persons reacted differently to these drugs and that the attending physician could best make the decision as to prescribing them. He found no addictive pattern from charts showing quantities furnished.

A psychiatrist who had been consulted by Mrs. Weber stated that he had found her very depressed and had prescribed medication as an anti-depressant, but had difficulty in getting her to take it as often as she should. He stated there had been a marked improvement in her condition and expressed the opinion she had the ability to maintain herself and her child. He found no evidence of drug addiction or of withdrawal symptoms. A school teacher who is a neighbor frequently transports the daughter to and from school. She testified that the child is always well groomed. She visits in the home where Mrs. Weber and the child are living and said that she found it as well kept as most homes and saw no evidence of excessive use of alcohol by Mrs. Weber. This witness said that the child is her mother's main interest and that she had seen Mrs. Weber in the yard entertaining her daughter and other neighborhood children. The wife of one of the men with whom Mrs. Weber was accused of keeping company said she was a frequent visitor and companion of Mrs. Weber. She said Mrs. Weber had been entrusted to

keep her children while she and her husband went to New Orleans. She said she had not seen Mrs. Weber intoxicated, but had seen her emotionally upset before Christmas 1972. According to this witness, Mrs. Weber's emotional condition had improved since January 1973. She was of the opinion that Mrs. Weber was very capable of taking care of herself and her family.

Mrs. Weber testified she had not taken any of the drugs previously prescribed for her in two or three weeks, and that she had discontinued one of the three scheduled drugs in November 1972 and another in January or February 1973. She professed to have no withdrawal symptoms and attributed her improved condition since the separation to relief from mental stress which she attributed to the strained relations between her and her husband. Another witness described her as a good mother.

It seems obvious to us that the chancellor accepted Mrs. Weber's version of the drug use and her witnesses' evaluation of her conduct and ability to properly care for the child. We cannot say that this was error or that the chancellor incorrectly weighed the evidence.

Since we cannot say that the chancellor's findings were clearly against the preponderance of the evidence in any respect, we affirm the decree.