Pamela F. SKOKOS *v.* Theodore C. SKOKOS

95-1029 968 S.W.2d 26

Supreme Court of Arkansas
Opinion delivered April 16, 1998
[Opinion on granting of rehearing issued June 4, 1998█]

522

*Henry Hodges*; and *Robinson, Staley & Marshall*, by: *Robert L. Robinson Jr.*, for appellant.

*Dover & Dixon, P.A.*, by: *Philip E. Dixon*; and *Dodds, Kidd, Ryan & Moore*, by: *Judson C. Kidd*, for appellee.

DAVID NEWBERN, Justice. Pamela F. Skokos, the appellant, filed a complaint for divorce against Theodore C. Skokos, the appellee, on June 1, 1993. Custody and property issues were litigated before Chancellor Alice Gray in hearings that were protracted and acrimonious. The final decree, entered on March 30, 1995, granted a divorce to Ms. Skokos, awarded custody of the parties' minor child to Mr. Skokos, and divided property. Prior to the entry of the decree, while the case was pending in the Chancery Court, the parties brought matters before this Court for reso-

lution. *See Skokos v. Gray*, 318 Ark. 571, 886 S.W.2d 618 (1994)(denying Ms. Skokos's petition for writ of *certiorari* to disqualify Chancellor Gray, Mr. Skokos's attorney, and attorney *ad litem*); *Hodges v. Gray*, 321 Ark. 7, 901 S.W.2d 1 (1995)(affirming in part and reversing in part on Ms. Skokos's counsel's interlocutory appeal from contempt citations).

Following entry of the final decree, Ms. Skokos filed on August 14, 1995, a motion to vacate the judgment under Ark. R. Civ. P. 60. Ms. Skokos was unable to obtain a hearing and ruling on the Rule 60 motion, and she appealed to this Court and asked that the case be remanded for the adjudication of that motion. We granted her request in *Skokos v. Skokos*, 322 Ark. 563, 909 S.W.2d 653 (1995). Ms. Skokos again moved that we disqualify Chancellor Gray, who, in her response to Ms. Skokos's motion, announced her decision to recuse. We accepted Chancellor Gray's recusal and assigned Chancellor Jim Hannah to preside on remand. Chancellor Hannah held a hearing on Ms. Skokos's Rule 60 motion and denied it in an order filed on July 17, 1996.

Ms. Skokos now appeals from the final decree entered by Chancellor Gray and the order entered by Chancellor Hannah denying her motion to set aside the decree.

In seeking reversal of the decree, Ms. Skokos first argues that the Chancellor erroneously determined that the Skokoses had made an effective gift of three of their residences, held as tenancies by the entirety, to "qualified personal residence trusts" and that the residences were owned by the trusts, rather than the Skokoses, and thus were not subject to division under Ark. Code Ann. §§ 9-12-315 and 9-12-317 (Repl. 1993 and Supp. 1997). Second, she argues that the Chancellor undervalued the Skokoses' shares in two cellular-telephone companies as a result of erroneous evidentiary rulings excluding expert testimony offered by Ms. Skokos and limiting her cross-examination of Mr. Skokos's expert witness. Third, Ms. Skokos argues that the Chancellor erred in rejecting her claim of entitlement to a "surcharge" or "reimbursement" for allegedly "improper" payments made by Mr. Skokos with marital funds. Fourth, she argues that Chancellor Gray erred by refusing to recuse.

Ms. Skokos further asserts that the judgment should have been vacated or set aside under Ark. R. Civ. P. 60(c)(4) on account of what she views as "extrinsic fraud" practiced upon the Chancery Court by one of Mr. Skokos's trial counsel and the attorney *ad litem* appointed to represent the minor child. Ms. Skokos does not seek reversal of Chancellor Gray's custody ruling or maintain that she is entitled under Rule 60 to relief from that part of the judgment granting her a divorce and vesting Mr. Skokos with custody of the minor child.

Mr. Skokos urges an affirmance on these points but maintains as a preliminary matter that Ms. Skokos waived her right to bring this appeal when she accepted over $6 million in cash or other assets that Mr. Skokos conveyed to her in accordance with the property division prescribed by Chancellor Gray's decree.

We conclude that some, but not all, of Ms. Skokos's arguments have merit. Thus, we affirm the decree in part and reverse it in part and remand the case for further proceedings consistent with this opinion.

### 1. Waiver of appeal

As to Mr. Skokos's assertion that Ms. Skokos waived her right to appeal when she accepted over $6 million in cash and other assets provided in the decree, we hold that he waived his right to contend the appeal is barred. We do conclude that Ms. Skokos is barred from appealing from the ruling made on her request that the decree be set aside pursuant to Rule 60, as that was not included in the waiver.

█ An appellant "waives his right to an appeal by accepting a benefit which is inconsistent with the claim of right he seeks to establish by the appeal." *Shepherd v. State Auto Property & Cas. Ins. Co.*, 312 Ark. 502, 509, 850 S.W.2d 324, 327 (1993), *quoting Bolen v. Cumby*, 53 Ark. 514, 515, 14 S.W. 926, 927 (1890). *See also Jones v. Rogers*, 222 Ark. 523, 525, 261 S.W.2d 649, 650 (1953) (stating "when an appellant accepts a portion of a challenged order inconsistent with his appeal, he thereby waives his appeal"). No doubt Ms. Skokos's acceptance of benefits from

some portions of the decree would bar her appeal but for the agreement entered between her and Mr. Skokos to the contrary.

The agreement at issue here was signed by Henry Hodges, counsel for Ms. Skokos, and Judson C. Kidd, counsel for Mr. Skokos. The agreement is contained in the following letter, dated April 13, 1995, from Mr. Hodges to Mr. Kidd:

> HAND DELIVERED
>
> . . . . . . . . . . . . . . . . . . . . . .
> Dear Jud:
>
> This will confirm our various discussions concerning your delivery of checks, stock certificates, and other property pursuant to the Court's Decree entered March 30, 1995. It is understood and agreed that Pam is accepting these funds and these properties subject to a reconciliation of the accounting ordered to be furnished by Mr. Skokos and, of course, *subject to her right to appeal the Decree. In other words, it is understood there is no prejudice to Pam's right to appeal* and Pam's right to be furnished an accounting that is acceptable according to the terms of the Decree.
>
> Kind regards,
> /s/ Henry
> Henry Hodges
>
> . . . . . . . . . . . . . . . . . . . . . . .
> [Emphasis added]

The following appears below Mr. Hodges's signature:

> ACCEPTED AND AGREED TO:
> /s/ Judson C. Kidd
> Judson C. Kidd

■ Although we are aware of no case on point, we can conceive of no reason to reject the position that an appellee may, as Mr. Skokos has done in part, "waive" his right to declare a waiver of appeal on the part of an appellant. Thus, an appeal should not be dismissed where, as here, the appellant has acted in reliance upon the appellee's promise that her acceptance of payment under the judgment will not prejudice her right to appeal.

Mr. Skokos contends, however, that the agreement merely conferred on Ms. Skokos the right to question a forthcoming accounting of Mr. Skokos's expenditure of marital funds during

the pendency of the divorce action and did not confer the right to appeal the decree. Mr. Skokos asserts, in the alternative, that the agreement is ambiguous and, in accordance with *Don Gilstrap Builders v. Jackson*, 269 Ark. 876, 601 S.W.2d 270 (Ark. App. 1980), should be construed against Ms. Skokos, the drafter. Mr. Skokos claims that he would not have made any payment to Ms. Skokos under the decree "if he had thought [Ms. Skokos] was reserving a right to appeal to force him to make even more payments."

■ As we read the agreement "and consider it from its four corners, as we must, its terms appear clear and unambiguous." *Barton v. Sturgis*, 224 Ark. 924, 927-28, 278 S.W.2d 114, 117 (1955). The agreement clearly and unambiguously states that Ms. Skokos would accept payment from Mr. Skokos subject to her right to an accounting *and* her right to appeal the decree. It is our duty to construe these unambiguous terms "according to the plain meaning of the language employed," *Roth v. Prewitt*, 225 Ark. 466, 469, 283 S.W.2d 155, 157 (1955); *see Unigard Security Ins. Co. v. Murphy Oil USA, Inc.*, 331 Ark. 211, 221, 962 S.W.2d 735, 740 (1998), and thus we hold that the agreement permits Ms. Skokos to appeal the decree in spite of her acceptance of benefits under it. Mr. Skokos's assertion that the agreement means anything else is, at best, facetious.

Whether the agreement permits Ms. Skokos to appeal from Chancellor Hannah's order denying relief under Rule 60 is a different matter. The agreement was signed on April 13, 1995, well before the filing of the Rule 60 motion on August 14, 1995, and the filing of Chancellor Hannah's order on July 17, 1996. By its terms, the agreement allows Ms. Skokos to appeal only the "decree." The agreement does not contemplate post-decree motions. Nothing in the text of the agreement expressly discusses, let alone permits, an appeal from a ruling on any type of post-decree motion. The parties could have included language permitting such an appeal had they chosen to do so.

■ Accordingly, we hold that the "right to appeal the decree" conferred on Ms. Skokos by the agreement does not encompass the right to appeal the order denying her motion

under Rule 60 to vacate the judgment. As Ms. Skokos's accept-
ance of over $6 million under the judgment is inconsistent with
her argument that the judgment should be vacated under Rule 60,
we conclude the point is waived.

### 2. *Personal residences*

The Skokoses acquired three personal residences during their
marriage — #10 Edgehill Road in Little Rock, and 131 Hosta
Bay and 1519 Long Point Lane in Hot Springs. Each was held by
them as tenants by the entireties. The Chancellor found that they
were not marital property at the time of the divorce because the
Skokoses had conveyed them to qualified personal residence trusts
("QPRTs") after agreeing between themselves to do so. The
QPRTs were created apparently for the purpose of avoiding taxa-
tion (*i.e.*, estate planning) but to maintain family control of the
residences.

Joe Gelzine, an attorney who drafted the QPRT documents,
testified that the device creates three interests in the property thus
conveyed: (1) a reversionary interest in the grantor, (2) a posses-
sory interest in the grantor, and (3) a contingent remainder inter-
est in beneficiaries of the trust. The grantor to a QPRT can end
the trust, forfeiting the tax benefits, and thus obtain his or her
reversionary interest.

The evidence was conflicting as to whether Mr. or Ms.
Skokos was the prime mover in setting up the QPRTs. We do
know, however, that while Mr. Skokos was away, participating in
the Desert Storm operation in 1991, Ms. Skokos, with Mr.
Gelzine's help, quitclaimed her interest in the Edgehill residence
to the Skokos family trust of which Mr. Skokos was trustee. As
Mr. Skokos's attorney in fact, she likewise quitclaimed his interest
to the family trust. By special warranty deed, Mr. Skokos thereaf-
ter conveyed the Edgehill property to himself, individually, and
then he conveyed the property to the QPRT by special warranty
deed, also signed by Ms. Skokos. A similar transaction occurred
with respect to the Hosta Bay property. The Skokoses' two chil-
dren were the contingent remaindermen named in these trusts.

Mr. and Ms. Skokos conveyed the Long Point Lane property by quitclaim deed to Ms. Skokos, individually, and she then conveyed it by special warranty deed to herself as trustee of a QPRT. The contingent remainderman was Dr. Kemp Skokos, Theodore Skokos's brother. Ms. Skokos's deposition testimony indicated that the gift to Kemp Skokos was made in gratitude for assistance (presumably financial) he had given as the Skokoses entered the cellular- telephone business.

Pursuant to these arrangements, Mr. Skokos, as grantor, retained a 25-year possessory interest in the Edgehill and Hosta Bay properties, and Ms. Skokos retained a 15-year possessory interest in the Long Point Lane property. Ms. Skokos lost her possessory interests in the Edgehill and Hosta Bay residences and was compensated for them in the divorce decree. The parties, however, were not required to account for the value of the reversionary interests they retained in those properties.

Ms. Skokos contends the conveyances to the QPRTs should be set aside because she was overreached by a "dominant spouse" in creating them. *See Shipp v. Bell,* 256 Ark. 89, 505 S.W.2d 509 (1974). There was evidence that Ms. Skokos is a college-educated person who sold real estate for a time and was thus at least somewhat familiar with property transactions, having been a "million dollar club" salesperson. The Skokoses' son, who was a law student when the QPRTs were created, recalled his mother discussing the trusts and acknowledging their effects with some concern over what might happen should she and Mr. Skokos ever divorce. Mr. Skokos is an attorney, and thus perhaps obviously more knowledgeable about such transactions than Ms. Skokos, but he contends that he had not heard of the QPRT idea before he left the country, that he was gone in 1991 when Ms. Skokos began the process, and that it was her idea to do so.

■ ■ It is enough to say that, where there is a factual dispute about the conditions surrounding the making of a deed, the determination by the Chancellor, whose job it is to assess the credibility of the witnesses, *Lawson v. Lawson,* 226 Ark. 643, 291 S.W.2d 518 (1956), will not be reversed unless it is clearly erroneous, *Calvin v. Calvin,* 308 Ark. 109, 823 S.W.2d 843 (1992), or

unless it is clearly against the preponderance of the evidence, *Weber v. Weber*, 256 Ark. 549, 508 S.W.2d 725 (1974), viewing the evidence in the light favorable to the appellee. *Dennis v. Dennis*, 239 Ark. 384, 389 S.W.2d 631 (1965). We must remand the case, however, for reconsideration of distribution of the parties' interests in the marital residences, not for any further consideration of the validity or effectiveness of the QPRT instruments and preceding conveyances, but because the reversionary interests that were created and acquired by the parties during the marriage were clearly marital property, *see* Ark. Code Ann. § 9-12-315(b) (Repl. 1993), and those reversionary interests were erroneously not considered in the distribution of the marital property.

### 3. Shares in cellular-telephone companies

Ms. Skokos asserts that the Chancellor's determination of the fair market value of the parties' shares in two cellular-telephone companies should be reversed on account of erroneous evidentiary rulings concerning the testimony of expert valuation witnesses. We agree that at least one of the rulings at issue constituted an abuse of discretion, requiring reversal.

Toward the end of their marriage, Mr. and Ms. Skokos acquired minority interests in two cellular-telephone companies. Using marital funds, they acquired a 49.99-percent interest in the Atlantic Cellular/New Hampshire RSA One, Limited Partnership ("the New Hampshire company"), and a 10.35-percent interest in the Little Rock Cellular Partnership ("the Little Rock company"). The Little Rock company apparently does business under the name of "Little Rock Cellular One." Title to the two blocks of shares was held by other companies owned solely by Mr. Skokos, but the parties agree that the shares at issue are marital property.

Mr. and Ms. Skokos agreed that the Chancellor should determine the fair market value of the shares and that Mr. Skokos would pay Ms. Skokos one half of the determined value and retain sole ownership of the shares.

Ms. Skokos first presented expert testimony from Steven Schroeder regarding the value of the shares in both the New

Hampshire company and the Little Rock company. Mr. Schroeder opined that the parties' shares in the New Hampshire company were worth $9 million, after applying a 20-percent "minority discount," and that their shares in the Little Rock company were worth $7.4 million, after applying a 30-percent "minority discount." Mr. Schroeder's written appraisal was admitted into evidence.

Ms. Skokos then sought to introduce expert testimony from Matthew Fox on the value of the parties' shares in the New Hampshire company. Mr. Fox was prepared to testify that those shares were worth between $8.6 million and $11.6 million and that the value of the shares should not be subjected to a "minority discount." Mr. Fox also would have challenged some of the views expressed by Thomas Buono, Mr. Skokos's expert witness, in his appraisal. Chancellor Gray, however, prohibited Ms. Skokos from introducing Mr. Fox's testimony and his written appraisal.

Mr. Skokos presented expert testimony from Mr. Buono and introduced his written appraisal into evidence. Mr. Buono testified that the value of the parties' 49.99-percent interest in the New Hampshire company was $7.58 million before consideration of any "discounts." Mr. Buono then applied a 55-percent "lack of marketability" discount, and a 15-percent "lack of control" discount, to arrive at an assessment of $2.9 million for the value of the parties' shares in the New Hampshire company.

Mr. Buono testified that the "pre-discount" value of the parties' shares in the Little Rock company was $6.076 million. He then applied a 45-percent "lack of marketability" discount, and a 20-percent "lack of control" discount, to arrive at an assessment of approximately $2.67 million for the value of the parties' shares in the Little Rock company.

Mr. Buono testified that the values he assigned to each block of shares might be subject to further "capital call" adjustments.

Counsel for Ms. Skokos cross-examined Mr. Buono for some period of time, but his examination was terminated when Chancellor Gray interrupted it and allowed Mr. Buono to leave the courtroom in order to board an airline flight. Thereafter, Ms.

Skokos recalled Mr. Schroeder and presented his testimony in rebuttal to Mr. Buono's.

In her final decree, Chancellor Gray indicated that she found Mr. Buono's "analyses and conclusions" to be "entitled to more weight and credibility" than those of Mr. Schroeder. The Chancellor accepted Mr. Buono's assessment of $2.9 million for the value of the parties' 49.99-percent interest in the New Hampshire company but subtracted $199,000, which represented the "outstanding capital call." The final value of these shares, according to the Chancellor, was approximately $2.7 million, and she ordered Mr. Skokos to pay half of that amount, or $1,350,500, to Ms. Skokos. The Chancellor also accepted Mr. Buono's assessment of $2,673,440 for the value of the parties' 10.35-percent interest in the Little Rock company. The Chancellor made no "capital call" adjustments to this figure, and she ordered Mr. Skokos to pay half of the above amount, or $1,336,720, to Ms. Skokos. Thus, the Chancellor determined that Ms. Skokos's interest in the shares of both companies was worth $2,687,220, and Ms. Skokos accepted payment in this amount from Mr. Skokos following entry of the final decree.

Ms. Skokos now maintains that the Chancellor abused her discretion when she prohibited Mr. Fox from testifying and later terminated Ms. Skokos's counsel's cross-examination of Mr. Buono. We agree with Ms. Skokos with respect to the exclusion of Mr. Fox's testimony. A closer question is presented with respect to the cross-examination of Mr. Buono, but we need not address it in view of our holding that the exclusion of Mr. Fox's evidence will require a new hearing on this point.

Chancellor Gray declined to allow Mr. Fox to testify as an expert because she believed he had a "conflict of interest." The conflict, according to the Chancellor, was based upon his employment as a vice president at Stephens, Inc., which owns a substantial amount of stock in the Alltel company, a competitor of Little Rock Cellular One. The Chancellor indicated that, on account of these factors, she "would have reason to question [Mr. Fox's] impartiality." Counsel for Ms. Skokos further suggested at trial that Mr. Fox should be prohibited from testifying on account of a

separate "conflict" based on an unrelated lawsuit filed by Mr. Skokos against Stephens, Inc., and other parties. In her ruling excluding Mr. Fox's testimony, however, the Chancellor did not mention that argument.

■ The Chancellor clearly erred in determining that Mr. Fox had a "conflict of interest" that rendered his expert testimony inadmissible *per se*. There is no dispute that Mr. Fox's involvement in this case was limited to reviewing information about the New Hampshire company and preparing an assessment of the Skokoses' 49.99-percent interest in that company. It is undisputed that the New Hampshire company has nothing to do with the Little Rock cellular-telephone market and does not compete with Alltel or any other entity in which Mr. Fox's employer, Stephens, Inc., has an interest. It also is undisputed that Mr. Fox had no occasion to review confidential financial records of the Little Rock company and that Mr. Fox would not have given an opinion as to the value of the parties' 10.35-percent interest in that company. Mr. Fox's testimony that he did not know much about the litigation between Mr. Skokos and Stephens, Inc., and had only read about the matter in the newspaper, was likewise unrefuted.

■ There is nothing in the record to suggest Mr. Fox had a conflict of interest that prevented him from giving an expert opinion on the value of the Skokoses' shares in the New Hampshire company. Nor do we agree that, if indeed he could have been considered biased, he should necessarily have been disqualified. *See DF&R Corp. v. American Intern. Pacific Industries Corp.*, 830 F. Supp. 500, 504–05 (D. Minn. 1993) (holding that evidence of "a conflict of interest or bias" was insufficient to warrant exclusion of expert witness's affidavit). *See, e.g., Senff v. Estate of Levi*, 515 N.E.2d 556, 559 (Ind.App. 1987)(stating "a bias or sentiment is not sufficient to cause a witness to be incompetent"); *Satterthwaite v. Estate of Satterthwaite*, 420 N.E.2d 287, 290 (Ind.App. 1981), *citing* 97 C.J.S. *Witnesses* § 168; *Sumter County v. Pritchett*, 186 S.E.2d 798, 802 (Ga.App. 1971)("A mere personal interest or bias does not render the witness incompetent to testify."); *Crier v. Marquette Cas. Co.*, 159 So.2d 26, 29 (La. App. 1964)("Interested persons are competent witnesses . . . .").

We also disagree with the contention that Mr. Fox's testimony might properly have been excluded as "cumulative" under Ark. R. Evid. 403. The Chancellor suggested that Ms. Skokos "would not be prejudiced" by her ruling excluding Mr. Fox's testimony as to the value of the Skokoses' shares in the New Hampshire company because Ms. Skokos had already presented Mr. Schroeder's testimony on that issue. Chancellor Gray appeared skeptical of Ms. Skokos's claim that she needed "two experts to testify to the value of the same cellular entity."

According to Ark. R. Evid. 403, relevant evidence may be excluded if its probative value is *substantially* outweighed by "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We have compared the testimony of both witnesses, and it does not appear the witnesses were so similar in their credentials, opinions, and approaches to the valuation question that the introduction of Mr. Fox's testimony would have amounted to a "*needless* presentation of cumulative evidence." Rule 403 (emphasis added).

### 4. Surcharges

Ms. Skokos asserted at trial that she was entitled to be reimbursed for one half of the allegedly "improper" payments made by Mr. Skokos with marital funds both before and after Ms. Skokos filed her complaint for divorce. The Chancellor determined the payments at issue were not improper and denied Ms. Skokos's request for a "surcharge" or reimbursement. Ms. Skokos argues on appeal that this determination was clearly erroneous and should be reversed. We affirm on this point.

In a divorce action, a spouse may recover his or her interest in marital property that the other spouse has transferred if the latter made the transfer for the purpose of defrauding the former of his or her interest in the property. *Pierson v. Barkley*, 253 Ark. 131, 133, 484 S.W.2d 872, 873 (1972); *Dowell v. Dowell*, 207 Ark. 578, 182 S.W.2d 344 (1944).

In *Ramsey v. Ramsey*, 259 Ark. 16, 531 S.W.2d 28 (1975), the wife was granted a divorce but appealed the Chancellor's division of property. We reversed and remanded, in part, because the

Chancellor had failed to make an award to the wife for personal property that her husband had fraudulently transferred. We said that

> there was a preponderance of the evidence to show that there was a wrongful disposition of personal property by appellee to defeat appellant's marital interest and that it was error for the court to refuse to consider or make any order concerning items removed by appellee. An extensive enumeration of these items was made by appellant and it was not substantially contradicted. *See Carr v. Carr*, 226 Ark. 355, 289 S.W.2d 899. *See also, Austin v. Austin*, 143 Ark. 222, 220 S.W. 46; *Wilson v. Wilson*, 163 Ark. 294, 259 S.W. 742.

*Ramsey v. Ramsey*, 259 Ark. at 23, 531 S.W.2d at 33. *See also Hardy v. Hardy*, 228 Ark. 991, 995, 311 S.W.2d 761, 763-64 (1958)("A husband has the right to make a transfer of his property, either with or without consideration, even though he strips himself of all means of supporting his wife, and leaves her without the means of subsistence, provided that he does so in good faith and without intention of defrauding her of her just claims upon him and his estate.")(citation omitted).

On appeal, Ms. Skokos argues that she is entitled to be reimbursed for one half of each of three particular transfers that, in her view, were improperly made by Mr. Skokos. She claims she is entitled to a 50-percent "surcharge" against: (1) a gift of $60,000 made to the Skokoses' three children through the Theodore C. Skokos Irrevocable Trust No. 3; (2) another $60,000 gift to the children allegedly made through the Theodore C. Skokos Irrevocable Trust No. 4; and (3) a $645,000 payment made by Mr. Skokos to Sheffield Nelson. Thus, Ms. Skokos seeks a reimbursement or surcharge for one half of $765,000, or $382,500. We hold that Ms. Skokos is not entitled to this sum.

### a. Gifts to children

Ms. Skokos maintains that Mr. Skokos improperly funnelled $120,000 in gifts to their three children through two successive trusts established at a Texas bank after Ms. Skokos had filed for divorce. Ms. Skokos testified at trial that she believed some por-

tion of these gifts should be "charged back" against Mr. Skokos but that she did not expect for her children to "pay [her] back." Ms. Skokos seeks a 50-percent "surcharge" with respect to the total $120,000 because she believes the gifts were made "without her knowledge and consent."

Two trusts are at issue here. The first trust — the Theodore C. Skokos Irrevocable Trust No. 3 — was created on October 1, 1993, after Ms. Skokos's complaint for divorce had been filed. The *corpus* of Trust No. 3 was stock that Mr. Skokos, as grantor, conveyed to the Texas bank serving as trustee. The trust terminated on January 17, 1994, at which time gifts of $20,000 were made to each of the three Skokos children, for a total gift of $60,000. The second trust — the Theodore C. Skokos Irrevocable Trust No. 4 — was created on October 20, 1994, also after the filing of Ms. Skokos's complaint for divorce. The terms of Trust No. 4 provided that the trust would terminate on January 16, 1995, at which time gifts of $20,000 would again be made to each of the three Skokos children. Trusts Nos. 3 and 4 were successors to a trust initially created by Mr. Skokos in 1992. The provisions of Trusts Nos. 3 and 4 were apparently the same as those established in connection with the 1992 trust.

Ms. Skokos argues on appeal that she is entitled to a 50-percent surcharge against the $60,000 gift made through Trust No. 3 *and* the $60,000 gift made through Trust No. 4. It appears, however, that Ms. Skokos made no request to the Trial Court to impose any surcharge with respect to the latter gift. The summary of "items to be surcharged to Ted Skokos" that was prepared and submitted to the Trial Court by Ms. Skokos's accountant included only the $60,000 gift that was made in January 1994 through Trust No. 3 and did not refer to any gift that might have been made through Trust No. 4. Ms. Skokos's proposed findings of fact and conclusions of law refer to only one of the two $60,000 gifts at issue. No reference is made to a date or the identity of a particular trust, but we assume it refers to the gift that was made in January 1994 through Trust No. 3. In any event, the pleading does not refer to *both* gifts that are mentioned on appeal.

We are not directed to any other place in the 15-volume abstract, and we have not located such a place, which demonstrates that Ms. Skokos requested the Chancellor to impose a surcharge on any gift made in connection with Trust No. 4. We are aware that counsel for Ms. Skokos mentioned Trust No. 4 in connection with an objection he raised in response to Mr. Skokos's testimony concerning the creation of the initial trust in 1992. Counsel objected that the testimony concerning the 1992 instrument was irrelevant because Ms. Skokos was "complaining about . . . the new trusts, Texas Trust Number Three and Four that Mr. Skokos created without Mrs. Skokos's agreement, and we think contrary . . . to the spirit and the terms of the Court's . . . restraining order entered when the divorce was filed." Even here, however, counsel voiced no request for a surcharge on any gift that might have been made through either trust. When Mr. Skokos later testified that the funds in Trust No. 4 had been frozen and that no gift had even been made to the children through that trust, counsel made no request for a surcharge and did not refute Mr. Skokos's claim. Counsel simply responded: "Well, we would ask that those gifts be frozen, Your Honor, and that $60,000 — if it's still there, we're very happy that it's there." Even if Ms. Skokos had requested the Chancellor to impose a surcharge on any gift that the children may have received through Trust No. 4, the Chancellor's final decree does not address such a claim. The abstract does not otherwise indicate that the Chancellor made a ruling on that issue.

 For these reasons, we do not reach the merits of Ms. Skokos's claim asserting an entitlement to a 50-percent surcharge on any gift the Skokos children may have received through Trust No. 4. We decline to address an argument if the abstract does not show that it was made in the Trial Court, *Webber v. Webber*, 331 Ark. 395, 400, 962 S.W.2d 345 (1998), *and* ruled upon there. *Sanders v. Bradley County Human Servs. Public Facility Bd.*, 330 Ark. 675, 683, 956 S.W.2d 187, 191 (1997).

The issue of Ms. Skokos's right to a surcharge on the gift made through Trust No. 3, however, is preserved for our review. Ms. Skokos clearly raised that issue with the Chancellor, and the

Chancellor's order addressed, and rejected, the argument as follows:

> The three children received $20,000 each in early 1994 from a joint trust fund. The payments were made pursuant to a multi-year estate plan previously agreed upon by the parties. Plaintiff wants one half of each payment back, but wants Defendant to repay her rather than the children. The request lacks merit.

We hold that the Chancellor's ruling is not clearly erroneous. There is ample evidence in the record that supports the Chancellor's conclusion that the gift through Trust No. 3 was not improperly made.

The testimony showed that Trust No. 3 succeeded a trust that Mr. Skokos created in 1992 during a trip to Texarkana, Texas. Mr. Gelzine testified that he flew to Texarkana with Mr. and Ms. Skokos and their children and that they met with personnel from a Texarkana bank and executed the appropriate documents. Mr. Gelzine testified that he recommended the provision for the $20,000 per child gift in order to reduce the Skokoses' tax liability. Mr. Gelzine testified that, as far as he could determine, "everyone was clear on what the provisions of the trust [were]."

Mr. Skokos testified that he and Ms. Skokos "visited at length" about the creation of the 1992 trust and the provision for the gifts to the children. He testified that he and Ms. Skokos wanted to fashion the trust so that the children would receive the gift over a period of several years. According to Mr. Skokos, the terms of the successor trusts did not vary from those he had discussed with Ms. Skokos prior to the creation of the 1992 trust.

In support of her claim that the gifts to the children under Trust No. 3 were improper, Ms. Skokos relies on Mr. Gelzine's concessions in his testimony that: (1) he helped prepare the trust documents but did so without seeking Ms. Skokos's input or involving her in the process; and (2) he prepared the trust documents at Mr. Skokos's direction and upon verifying with Mr. Kidd that he "could go ahead and set up another Texas trust." Mr. Gelzine added, however, that Trust No. 3 was created only for tax-relief purposes.

█ Whether or not Ms. Skokos was aware of, or consented to, the creation of Trust No. 3 and the $60,000 gift to her children that was authorized by the trust, we know of no authority that entitles a spouse to be reimbursed in a divorce proceeding for every nonconsensual transfer of marital funds made by the other spouse. Under the rule announced in *Pierson v. Barkley*, *supra*, and *Ramsey v. Ramsey*, *supra*, and the other cases cited above, it was necessary for Ms. Skokos to prove that Mr. Skokos effectuated that transfer of marital property (the $60,000) with the specific intent to defraud Ms. Skokos of her interest in that property. Proof of that sort is clearly lacking in the record.

### b. Payments to Sheffield Nelson

Ms. Skokos also maintains that she is entitled to a 50-percent surcharge against $645,000 that Mr. Skokos transferred to Sheffield Nelson by payments made both before and after the filing of her complaint for divorce. Mr. Skokos acknowledges that he paid that amount to Mr. Nelson in three installments: $450,000 on October 2, 1991; $100,000 in April or May of 1993; and $95,000 in November of 1993. Ms. Skokos claims the payments were improper, and therefore subject to a surcharge, because they were part of a "secret" and "illegal" referral fee that Mr. Skokos paid to Mr. Nelson in return for an attorney-referral to him of a shareholders' derivative case involving Worthen Bank, a case for which Mr. Skokos received an attorney's fee following a settlement hearing in February 1988.

Ms. Skokos claims that any payment of fees by Mr. Skokos to Mr. Nelson for referring the Worthen Bank case would have been "illegal" and "unethical" because Mr. Skokos, during the settlement hearing, did not disclose that Mr. Nelson would be sharing in the fees awarded and represented to the presiding judge that he would not share the fees with anyone who was not disclosed. Ms. Skokos appears to base her theory upon written correspondence not admitted into evidence in which Mr. Skokos and Mr. Nelson, in the months following the settlement of the Worthen Bank case, discussed the possibility of Mr. Nelson receiving a $50,000 referral fee.

At trial, however, both Mr. Skokos and Mr. Nelson explained that the $645,000 payment had no relationship to the Worthen Bank case and was not a "referral fee" of any kind. According to their testimony, the payment was made pursuant to an agreement they reached concerning Mr. Skokos's operations in the cellular-telephone market.

Mr. Skokos testified that he received a cellular-telephone franchise through a lottery conducted by the Federal Communications Commission. Under the terms of the license approved on May 7, 1990, Mr. Skokos was required to commence operations within 18 months or else face forfeiture of the license. Concerned that he would not be able to obtain adequate financing within the allotted time, Mr. Skokos turned to Mr. Nelson for assistance in June 1990. They reached a verbal agreement whereby Mr. Skokos promised to pay a "loan-commitment fee" to Mr. Nelson in return for Mr. Nelson's promise to loan Mr. Skokos several million dollars if called upon to do so.

Mr. Skokos did not call upon Mr. Nelson for a loan, as he found other backing for his cellular-telephone venture. Although he had secured the financing promise of Mr. Nelson, Mr. Skokos hired the firm of Daniels and Associates to locate an investor. That firm located Atlantic Cellular, which paid $11.5 million to Mr. Skokos for a 50.01-percent controlling interest in the cellular-telephone franchise. The purchase and sales agreement, signed on February 28, 1991, by Ms. Skokos while Mr. Skokos was overseas, included a covenant on Mr. Skokos's part that no one, aside from Daniels and Associates, would receive a commission or finder's fee "in connection with the transaction contemplated by this agreement." The deal closed in April 1991, and Daniels and Associates received a finder's fee of $250,000.

Mr. Skokos testified that he could have "walked away" from the agreement with Mr. Nelson, as it would not have been necessary for him to rely on the line of credit that Mr. Nelson had promised to make available. Mr. Skokos testified that he discussed the matter with Ms. Skokos and indicated to her that he felt he should honor the agreement. According to Mr. Skokos, Ms. Skokos advised him to "do whatever you think is right."

Thereafter, Mr. Skokos and Mr. Nelson agreed in writing that Mr. Skokos would pay a negotiated fee of $650,000. The Chancellor received into evidence a written memorandum, dated October 2, 1991, that Mr. Nelson wrote to Mr. Skokos recounting the terms of their agreement on "the New Hampshire Cellular matter." Mr. Skokos promised to pay $450,000 on October 2, 1991; $100,000 in April 1993; and $100,000 in April 1994. In his memorandum, Mr. Nelson referred to the payments as a "finder's fee/legal fee." Mr. Skokos testified that he discussed the agreement with Ms. Skokos. According to Mr. Skokos, "She told me to do whatever I thought was right, and I said, I think this is right. I owe the money, and I paid it." Ms. Skokos acknowledged in her deposition that she viewed the obligation that Mr. Skokos had incurred as a marital debt.

Mr. Skokos testified that he made the first two payments more or less as scheduled but that he renegotiated the terms regarding the third payment so that Mr. Skokos paid only $95,000 but did so in November 1993, earlier than originally scheduled. Mr. Skokos testified that he sought to make a reduced payment ahead of schedule because "I wanted to get my affairs in order before my divorce trial started." Thus, the total amount paid to Mr. Nelson was $645,000. It appears that some, if not all, of these payments were (1) reported by Mr. Nelson as income on his tax returns; and (2) reported by Mr. and Ms. Skokos as business-expense deductions on joint tax returns that each of them signed.

Mr. Skokos and Mr. Nelson acknowledged in their testimony that they had discussed in 1988 the possibility of Mr. Nelson receiving a $50,000 fee for having referred the Worthen Bank case. They testified, however, that they ultimately dropped the matter when Mr. Skokos refused to pay a referral fee and that the payment of $645,000 bore no relationship to the Worthen Bank case. In one of the memoranda cited by Ms. Skokos, Mr. Skokos makes clear his intention not to pay any fee for Mr. Nelson's referral of the case.

Ms. Skokos's accountant testified that the $645,000 payment did not pass the "smell test," noting that a reasonable fee for a $1,000,000 line of credit would only be $100,000. Our under-

standing of the testimony is, however, that Mr. Nelson was ready to advance "several million" dollars.

The Chancellor, evidently relying on the above testimony, and the acknowledgement by Ms. Skokos in a deposition that the obligation to Mr. Nelson was a marital one, rejected Ms. Skokos's contention that the payment to Mr. Nelson was subject to a "surcharge":

> Plaintiff seeks to surcharge Defendant for funds paid to Sheffield Nelson. Plaintiff previously acknowledged the debt to Sheffield Nelson pursuant to an agreement made years before the parties separated. The debt was a marital responsibility. There is insufficient evidence in this record to establish any impropriety regarding the agreement and payments.

■■ The propriety or lack of propriety, other than in the context of the relationship between Mr. and Ms. Skokos, of the payments to Mr. Nelson is not at issue in this appeal. Rather, as noted above, we are concerned with whether the payments were made to defraud Ms. Skokos of her marital interest in the funds. "Ordinarily, we do not reverse a chancellor where the decision turns largely on disputed facts and witness credibility, as we accede to [her] superior position to observe the witnesses and gauge their demeanor." *Dopp v. Sugarloaf Mining Co.*, 288 Ark. 18, 21, 702 S.W.2d 393, 394 (1986). The ruling was not clearly erroneous.

### 5. Recusal

The final argument advanced by Ms. Skokos in support of reversing Chancellor Gray's decree is that the Chancellor erred in declining numerous requests made by Ms. Skokos's counsel that she recuse from the case. We affirm on this point.

In *Skokos v. Gray*, 318 Ark. 571, 886 S.W.2d 618 (1994), we denied Ms. Skokos's *certiorari* request to disqualify Chancellor Gray. We held that *certiorari* does not lie for such discretionary matters as recusal, and we noted that the grounds asserted in support of the judge's recusal in the petition could not be argued later in the event of an appeal from the final decree. *Id.* at 575, 886 S.W.2d at 621. Ms. Skokos invites us to reconsider this point and

to consider the conduct Ms. Skokos mentioned in the petition for the writ. We decline to do so. We only consider at this point facts occurring subsequent to our denial of the writ that are cited in Ms. Skokos's brief as bases for holding the Chancellor should have recused.

■ Ms. Skokos points to the following events. First, she says a disqualifying bias was evident in the rulings excluding Mr. Fox's testimony and limiting the cross-examination of Mr. Buono. Second, she contends the Chancellor failed to make a timely disclosure of her relationship with a law partner of Byron Eiseman, an attorney scheduled to testify as an expert witness for Mr. Skokos. Third, she maintains the Chancellor should have recused because her court reporter communicated with another judge about the conduct of Ms. Skokos's counsel.

> Judges must refrain from presiding over cases in which they might be interested and must avoid all appearance of bias. *Reel v. State*, 318 Ark. 565, 886 S.W.2d 615 (1994). However, we will not reverse a judgment on the basis of a trial judge's decision not to disqualify unless the judge has abused her discretion. *Id.* To decide whether there was an abuse of discretion, we review the record to determine if any prejudice or bias was exhibited. *Id.* The question of bias is usually confined to the conscience of the judge. *Noland v. Noland*, 326 Ark. 617, 932 S.W.2d 341 (1996). Judges are presumed to be impartial, and the party seeking disqualification has the burden of showing otherwise. *Turner v. State*, 325 Ark. 237, 926 S.W.2d 843 (1996).

*Dolphin v. Wilson*, 328 Ark. 1, 4, 942 S.W.2d 815, 817 (1997).

### a. Evidentiary rulings

■ Bias will not ordinarily be evidenced in the fact of adverse rulings such as the evidentiary rulings complained of in this case. *See Trimble v. State*, 316 Ark. 161, 172, 871 S.W.2d 562, 567 (1994); *Roe v. Dietrich*, 310 Ark. 54, 59, 835 S.W.2d 289, 292 (1992). Although we have determined it was error to have refused Mr. Fox's testimony and may have been error to have limited the cross-examination of Mr. Buono, we cannot say that those rulings exhibited the sort of personal bias toward Ms. Skokos's case that would have required recusal.

### b. Byron Eiseman

Henry Hodges, one of Ms. Skokos's lawyers, filed a complaint against the Chancellor with the Judicial Discipline and Disability Commission on a matter not related to this case. In that proceeding, the Chancellor was represented by a member of the law firm of Friday, Eldredge, and Clark. During the phase of the trial concerned with the QPRTs, Byron Eiseman, a member of that firm, appeared in the courtroom. The Chancellor noted the fact that persons she did not know were in the courtroom. Later, she realized that Mr. Eiseman was a member of the Friday firm. She announced it was her practice to recuse in matters in which the Friday firm served as counsel, and she invited motions.

Counsel for Ms. Skokos moved that the Chancellor recuse. The contention was that Mr. Eiseman's name had been on Mr. Skokos's witness list and that the Chancellor thus should have known of his connection with Mr. Skokos much earlier. In addition, Mr. Eiseman's name and his potential testimony, although not the name of his law firm, had been mentioned orally several times in the proceedings. After the Chancellor made her announcement, counsel for Mr. Skokos withdrew Mr. Eiseman as an expert witness. Mr. Eiseman left the courtroom and did not testify. The Chancellor took the motion under advisement and later announced she would not recuse.

Ms. Skokos asserts that recusal was necessary, in spite of the fact that Mr. Eiseman was withdrawn as a witness and never testified, because of Mr. Eiseman's "improper participation" in the case, consisting of sitting at counsel's table and being "*de facto*, if not *de jure*, co-counsel to [Mr. Skokos] in the trial."

The Chancellor's explanation in response to the motion included the fact that she had not read the witness list and that she did not realize a member of the Friday firm was in the courtroom until she recalled seeing Mr. Eiseman's name on correspondence, apparently from her attorney.

We cannot tell from the record before us the extent, if any, of Mr. Eiseman's participation in this case beyond having been consulted and listed as an expert witness for Mr. Skokos. We

note the Chancellor's remarks that she did not know him and that he had, to her knowledge, not appeared before her previously. The record does not demonstrate any bias resulting from the incident, and, given the withdrawal of Mr. Eiseman, we cannot say any appearance of bias was such as to require recusal.

### c. Marjorie Gachot and Judge John Harkey

The final basis asserted by Ms. Skokos for Chancellor Gray's recusal is a communication made by the Chancellor's court reporter, Marjorie Gachot, to the Honorable John Harkey, of Batesville, a chancellor in a separate judicial district. Ms. Skokos's counsel alleged the communication demonstrated that the Chancellor was conducting an "investigation" of Bob Robinson, one of her lawyers, and that bias against her and her counsel was thus apparent. A motion for recusal was filed on February 6, 1995, attaching an affidavit from Judge Harkey. We affirm on this point.

There was considerable skirmishing over the holding of a hearing on the motion. Ms. Skokos's counsel wanted the hearing to be held with Judge Harkey's testimony being taken by telephone. Counsel for Mr. Skokos insisted on having Judge Harkey present in the courtroom for cross-examination. Counsel for Ms. Skokos sought a continuance, which was not granted, for that purpose. He also attempted to have Chancellor Gray testify under oath.

A hearing was held during which Mr. Robinson read from Judge Harkey's affidavit to the effect that Chancellor Gray's court reporter, Marjorie Gachot, had called to speak with Judge Harkey's court reporter and, upon learning that she was unavailable, spoke with Judge Harkey. Ms. Gachot allegedly asked about Mr. Robinson's conduct in Judge Harkey's court, suggesting that Mr. Robinson's conduct had been a problem.

Ms. Gachot testified at the hearing that she had been a court reporter since 1967 and had worked with Chancellor Gray for two years. She said she had indeed called to speak with Judge Harkey's court reporter and that her conversation with Judge Harkey had lasted less than a minute. She said she asked only if Mr. Robinson had been in Judge Harkey's court. She insisted she did not tell

Judge Harkey about rumors she had heard about Mr. Robinson's conduct before him. She said Chancellor Gray had been made aware she was going to call and that she had made the call out of curiosity because she had been concerned about Mr. Robinson's behavior before Chancellor Gray and thought she might help solve the problem. She insisted that the affidavit of Judge Harkey was "not correct" in its statement that she impugned the conduct of Mr. Robinson.

The Chancellor again refused to recuse, and in her order she declared that Mr. Robinson was not being "investigated" by her or by her staff. She pointed out that, even if she had personally called Judge Harkey to discuss the matter of conduct of counsel, that would have been permissible in accordance with the Code of Judicial Conduct, Canon 3, § 7(c).

 We decline to reverse the Chancellor's decision not to recuse. The decision was, again, a discretionary one, and we cannot say the record demonstrates that the Chancellor was biased toward Ms. Skokos or her counsel.

In closing, we note that, after Chancellor Gray's recusal, Chancellor Jim R. Hannah was assigned to the case. Chancellor Hannah's assignment to this case will continue upon remand.

Affirmed in part; reversed in part, and remanded.

Special Justices JIM BURNETT, TED N. DRAKE, SEARCY W. HARRELL, JR., and LYNN WILLIAMS join in this opinion.

GLAZE, CORBIN, BROWN, and IMBER, JJ., not participating.