Pamela SKOKOS v. Theodore SKOKOS

99-1514 40 S.W.3d 768

Supreme Court of Arkansas
Opinion delivered April 19, 2001
[Petition for rehearing denied May 24, 2001.]

422

*Jeff Rosenzweig*, for appellant.

*Dover & Dixon, P.A.*, by: *Philip E. Dixon, Gary B. Rogers*, and *Monte D. Estes*; and *Judson C. Kidd*, for appellee/cross-appellant.

TOM GLAZE, Justice. Pamela and Theodore Skokos were married in 1967; they separated in May of 1993, and Pamela filed for divorce on June 1, 1993. Chancellor Alice Gray eventually granted Pamela a divorce by decree dated March 30, 1995. The decree also granted custody of their minor daughter to Theodore, and divided the marital property. Among the property divided by the decree were three homes, which had been placed in Qualified Personal Residence Trusts ("QPRTs"), and the couple's interests in two cellular telephone companies — one in Little Rock, and the other in New Hampshire. Pamela moved the trial court to vacate the decree. Because Pamela was unable to obtain a hearing or ruling on her ARCP Rule 60 motion, Pamela filed a partial record with this court and appealed, requesting us to remand the case, and

to order an adjudication on Pamela's motion. *Skokos v. Skokos*, 322 Ark. 563, 909 S.W.2d 653 (1995). In the interim, Judge Gray recused from the case, and this court appointed Chancellor Jim Hannah to preside on remand. Judge Hannah held a hearing on Pamela's motion and denied it. *Id.; see also Skokos v. Skokos*, 332 Ark. 520, 968 S.W.2d 26 (1998).

Pamela then appealed from the March 1995 divorce decree, contending that Judge Gray had erred in the following ways: the homes placed in trust were not marital property; the chancellor had made erroneous evidentiary rulings with respect to Pamela's expert witness testimony; the chancellor had erred in rejecting Pamela's reimbursement of allegedly improper payments Theodore made with marital funds; and Judge Gray had erred in refusing to recuse. We agreed in part with Pamela's first two points, and we remanded the case, requesting Judge Hannah to continue on remand. *Skokos v. Skokos*, 332 Ark. 520, 968 S.W.2d 26 (1998). Pamela petitioned for rehearing, and, in granting rehearing, we clarified our opinion by directing the trial court to redetermine the fair market values of the parties' interests in the two cellular phone companies. *Skokos v. Skokos*, 333 Ark. 396, 968 S.W.2d 26 (1998).

Prior to the hearing on remand, the parties presented briefs and arguments about how the various properties should be valued. Pamela noted that, after the March 30, 1995 divorce decree, Theodore had sold his interests in the cellular telephone companies for more than what those values were appraised at the time of the parties' divorce. She urged that the value of the interests should be determined as of the date of the trial on remand, so as to take into account the increase in value in determining what her half would be. Theodore responded that the phone company interests should be valued as of the date of the March 30, 1995 divorce decree. On March 19, 1999, the chancellor entered an order in which he found that, under Ark. Code Ann. § 9-12-315(a)(1)(A) (Supp. 1999), the parties' marital property should be valued as of March 30, 1995.

Judge Hannah subsequently held a five-day hearing, commencing on May 5, 1999. At the hearing, both Pamela and Theodore presented expert witnesses who testified regarding the values of the cellular telephone company interests and the reversionary interests in the QPRTs. Finding Theodore's expert witness to be more credible, the judge ordered that the cellular telephone companies should be valued at $3,238,172, and, since Pamela had already received $2,687,220, she should get another $550,952. On the question of the QPRTs, Judge Hannah found that Pamela's expert witness was more credible, and determined that Theodore still

owed Pamela $546,536 for her one-half interest in the reversionary interests in the trusts.

From that order, Pamela has appealed, and Theodore has cross-appealed. Pamela argues that Judge Hannah erred in determining the value of the cellular phone companies in two respects: 1) by using the March 30, 1995 date of the parties' divorce decree as the time at which the interests should be valued; and 2) by applying large discounts to account for the fact that the interests being sold were minority interests in the companies. On cross-appeal, Theodore contends that Judge Hannah erred in valuing the parties' reversionary interests in the QPRTs, and in denying a reduction in the award based on the applicable capital gains tax. We first address our standard of review in these matters.

■■ On appeal, chancery cases, such as divorces, are reviewed *de novo. Box v. Box,* 312 Ark. 550, 851 S.W.2d 437 (1993). With respect to the division of property in a divorce case, we review the chancellor's findings of fact and affirm them unless they are clearly erroneous, or against the preponderance of the evidence; the division of property itself is also reviewed, and the same standard applies. *Id.; Bagwell v. Bagwell,* 282 Ark. 403, 668 S.W.2d 949 (1984). A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed. *Huffman v. Fisher,* 343 Ark. 737, 38 S.W.3d 327 (2001). In order to demonstrate that the chancellor's ruling was erroneous, an appellant must show that the trial court abused its discretion by making a decision that was arbitrary or groundless. *Webber v. Webber,* 331 Ark. 395, 962 S.W.2d 345 (1998). We give due deference to the chancellor's superior position to determine the credibility of witnesses and the weight to be given their testimony. *Myrick v. Myrick,* 339 Ark. 1, 2 S.W.3d 60 (1999).

■ Keeping these standards in mind, we turn to Pamela's first argument, wherein she argues that the chancellor abused his discretion by applying the date of the divorce, rather than that of the remand hearing, as the date on which to value the cellular telephone companies. Ark. Code Ann. § 9-12-315(a)(1) (Repl. 1998) provides that, "[*a] t the time a divorce decree is entered*[,] [a]ll marital property shall be distributed one-half (1/2) to each party unless the court finds such a division to be inequitable." (Emphasis added.) Cases interpreting this statute have clearly stated that this means that marital property is required to be distributed at the time the divorce is entered. *See Hadden v. Hadden,* 320 Ark. 480, 483, 897 S.W.2d 568, 569 (1995); *Askins v. Askins,* 288 Ark. 333, 335, 704 S.W.2d 632 (1986). Obviously, for a chancellor to determine if there is an

equitable (or inequitable) division of the marital property at the time of the parties' divorce, the chancellor must know the value of the parties' property interests for distribution purposes. Accordingly, based on § 9-12-315(a)(1), the trial court in the present case held that it should determine the value of the parties' marital property as of the date of the divorce — March 30, 1995.

■ Pamela cites to several cases from other jurisdictions which seem to hold that the date of a remand, rather than the initial divorce decree, should control in valuation and division of marital property purposes. She cites no Arkansas citation of authority for such a proposition, and, as already stated, our own statutory law and case law are clear that marital property is to be divided at the time the divorce decree is entered. Thus, we hold the chancellor acted correctly in using March 30, 1995, as the date for determining the value of the two companies.

Pamela's second point concerns Judge Hannah's conclusions regarding the actual monetary value to be placed on the two companies. Judge Hannah determined that Pamela's one-half share of both properties should be valued at $3,238,172, and, since Pamela had already received $2,687,220 after the first divorce decree, she was entitled to another $550,952. Pamela now asserts the judge erred with respect to three issues: 1) the value of the companies; 2) the application of "minority discounts"[1] to their value; and 3) the unfair result that stems from the use of such discounts.

Both parties presented the testimony of several expert witnesses. Pamela's experts offered appraisals ranging from $5.68 million to $9.86 million for the Little Rock company, and from $5.56 million to roughly $10 million for the New Hampshire company. Of her witnesses, only one, Sharon Armbrust, applied minority discounts. In this respect, Armbrust suggested that discounts of 35% for Little Rock and 30% for New Hampshire would have been appropriate, based on the lack of control and marketability inherent in the ownership of a minority interest.

Theodore's experts, on the other hand, appraised the companies at values ranging from $2.91 million to $3.1 million for New Hampshire, and $2.89 million to $2.94 million for Little Rock.

---

[1] A minority discount is an allowance or deduction applied to the value of a minority interest, such as the Skokoses held in these companies; the discount reflects that the interest may be worth less to a potential buyer because of the lack of marketability and lack of control inherent in owning only a minority interest in a company.

Both of Theodore's experts, Thomas Buono and James Rabe, applied minority discounts to the two companies. Buono calculated a 57% discount for Little Rock and approximately 50% for New Hampshire; Rabe figured a minority discount of 45% for Little Rock and 40% for New Hampshire.

After considering the evidence offered by both parties, Judge Hannah found that the application of minority discounts would be appropriate because of the parties' minority stand-alone interests in the company; the judge also found that Buono's testimony should be given more weight and was more credible than that of the other witnesses. Buono, the president and CEO of BIA Consulting, asserted that his company appraised between 200 and 300 companies a year, with a few hundred cellular companies included in that number. Buono received a degree in applied mathematics and a M.B.A. from Dartmouth College; he also held memberships in wireless communication trade associations, and maintained his status in the American Society of Appraisers. Buono additionally inspected both the Little Rock and New Hampshire facilities, and interviewed the general manager of the Little Rock Company. His figures were based on a thorough analysis of a host of factors, including the fact that the interests to be appraised were minority interests that, in March of 1995, lacked a large degree of control and marketability. Bueno testified that in 1995 the cellular market did not look promising, and the sales Theodore eventually made could not have been foreseeable in 1995.

By contrast, Pamela's experts had little or no training in appraising cellular companies, and none of them had an affiliation with any national appraisal society. Given the deference this court accords to the chancellor's superior position to judge the credibility of witnesses, we cannot say that Judge Hannah abused his discretion in finding Buono's testimony to be worthy of greater weight. *See Jackson v. Buchman*, 338 Ark. 467, 996 S.W.2d 30 (1990). Pamela attempts to argue that, because the companies actually sold for much more than the values assigned to them by the subsequent appraisals, the assessed value was improperly low. However, her argument ignores the fact that the properties were properly valued as of the date of the divorce decree, at which time the companies had not yet been sold.[2] Moreover, expert testimony established, too, that certain tagalong rights and a put/call provision that

---

[2] The Little Rock company sold some eighteen months after the divorce for $9,987,313.86; New Hampshire sold some three and half years later for $16,219,544.

accompanied the 1998 New Hampshire sale did not exist in March of 1995.[3] Finally, two other highly significant events affected the March 30, 1995 valuation as opposed to the subsequent sale price: (1) Competition from the new PCS spectrum cell phones, which depressed the value of existing cell phone properties; and (2) the passage of the Telecommunications Act in 1996, which served to significantly enhance the value of existing cell phone properties. Because the appropriate date for valuation and division of properties was March 30, 1995, the chancellor was correct in not considering the subsequent sales prices of the companies.[4]

Theodore raises two points on cross-appeal: 1) Judge Hannah erred in determining the value of certain interests in the Qualified Personal Residence Trusts; and 2) the judge erred in denying a reduction by a capital gains tax in Pamela's fair market value in the two cellular companies.

---

[3] According to *Black's Law Dictionary*, 1237 (6th ed. 1990), a "put" is an option permitting its holder to sell a certain stock or commodity at a fixed price for a stated quantity and within a stated period. Such a right is purchased for a fee paid the one who agrees to accept the stock or goods if they are offered. The buyer of this right to sell expects the price of the stock or commodity (the put) at a profit. If the price rises, the option need not be exercised. A "call" is an option or contract giving the holder the right to purchase a stated number of shares of stock at a specified price on or before a certain fixed date. Stated another way, a put in the language of the commodity or stock marked is a privilege of delivering or not delivering the subject matter of the sale; and a call is a privilege of calling or not calling for it. According to Pamela's expert, Jeffrey Fox, the "tagalong" provision meant that if the general partner elected to find a buyer to sell his partnership, the minority partner would have the right to tag along and force sale of that interest at the same pro rata price.

[4] We note that, in arguing this point, Pamela also argues that the discounts used were too large, and further asserts that this valuing minority discounts issue is one of mixed question of law and fact. Citing *Wal-Mart Stores, Inc. & Subsidiaries v. Comm'r of Internal Revenue*, 153 F.3d 650 (8th Cir. 1998), she claims the accounting principles relied on by the trial court here were erroneous. The *Wal-Mart* case, however, involved an accounting method to account for inventory levels, and did not involve valuating discount interests. The federal case is not applicable or in any way binding here. Moreover, Pamela agrees the method used by Theodore's experts to determine the minority discounts was proper, but at the same time, still argues that method should be "trumped" by the later actual sales. She also fails to show the trial judge was clearly erroneous in accepting the valuation method utilized by Theodore's expert testimony. On this same point, Pamela cited the case of the *Arkansas State Highway Commission v. Smith, Jr.*, 254 Ark. 644, 495 S.W.2d 147 (1973), and argues a sale occurring years after the taking of property can be used to establish the value of the property taken. That case, too, is of no help or application here, since the *Smith* case was an eminent domain matter and no statute was controlling there, like § 9-12-315(a)(1) in the instant case. We also point out that the *Smith* court specifically stated that the reason why it was not error for the trial court to consider subsequent sale data was because there was no indication that circumstances had changed materially between the valuation date and the sale date, i.e., the subsequent sale data might be a relevant indicator of value as of the previous date. However, in the instant case, such a comparison could not be made because of the change of several material factors between the two dates.

On the question of the QPRTs, these trusts are estate-planning devices which permit the grantor to place a piece of real estate in trust, yet allow the grantor to retain a possessory interest in the property for a term of years. The creation of a QPRT results in three distinct interests in the property. First, there is a possessory interest, or the right retained by the grantor to use the residence for a term of years. Next, there is a reversionary interest, which would be the value of the interest that could potentially come back to the grantor; finally, there is the remainder interest which would pass to the eventual beneficiaries of the trust. If the grantor survives the selected term of years of the possessory interest, then the residence would be transferred out of the grantor's estate and would then go to the beneficiaries (the remainder interest). If the grantor does not survive the possessory term, then the residence would revert back to the grantor's estate (the reversionary interest). On remand, Judge Hannah was to determine the value of the reversionary interest because Judge Gray had failed to consider that interest when she divided the parties' properties at the March 30, 1995 date of divorce. *See Skokos,* 332 Ark. at 531.

The Skokoses created three of these trusts in the early 1990s.[5] Into the first trust, Theodore placed their property located at #10 Edgehill in Little Rock, valued in fee (by stipulation of the parties) at $900,000. The corpus of the second trust was composed of the so-called "Hosta Bay" property, one of their homes in Hot Springs; this was valued in fee (by stipulation of the parties) at $620,000. This trust was also in Theodore's name. Theodore established a twenty-five-year possessory interest in these two properties. The third trust was created by Pamela, and included the "Longpointe" property, another lake home in Hot Springs valued in fee (by stipulation of the parties) at $141, 500. Pamela retained a fifteen-year possessory interest in this home.

The parties agree, and Judge Hannah likewise concluded, that the sum of the three interests created by a QPRT — the possessory, reversionary, and remainder interests — must equal the fair market value of the fee for each residence. Pamela and Theodore again presented expert witnesses on this issue. Pamela offered the testimony of Mike Lax and Richard Stephens; both of these witnesses began with the fee value of the homes and subtracted the sum of the possessory and remainder interests, using the figures for these

---

[5] The income tax regulations provide that a person cannot hold a term interest in more than two QPRTs. Because the parties have three residences, they could not both be grantors of all three and receive tax advantages.

two interests that had been determined at the first trial. Lax's final figure for the value of each party's reversionary interest in all three properties was $588,210.50. Stephens, who took into account the Skokoses' ages and adjusted for the federal discount rate as of March 30, 1995, calculated the value to be $546,536.

Byron Eiseman testified on Theodore's behalf. Mr. Eiseman, a tax lawyer, calculated the value of the reversionary interests by entering the various figures for the interests into a computer software program. Based on his analysis, Eiseman opined that the net value due Pamela for her one-half of the reversionary interests in the QPRTs totaled $62,106.50.

 In ruling on this issue, Judge Hannah specifically found Stephens's testimony to be more credible, and therefore awarded Pamela $546,536 for her half of the reversionary interests in the QPRTs. Theodore appeals this decision, arguing that the chancellor was not bound to accept the possessory value set out in the original decree. However, although he urges that there was no reason for the remand court to rely on that possessory value, we note that the only issue to be decided on remand was the value in fee of the reversionary interest. In our earlier opinion, we stated that Pamela "lost her possessory interests in the Edgehill and Hosta Bay residences and was compensated for them in the divorce decree. The parties, however, were not required to account for the value of the *reversionary interests* they retained in [the three] properties." (Emphasis added.) *Skokos*, 332 Ark. at 530. It does not appear from the 1998 *Skokos* opinion that either party appealed the first chancellor's decision on the value of the possessory interests. As a result, the trial court's decision on possessory interests became the law of the case. *See Vandiver v. Banks*, 331 Ark. 386, 962 S.W.2d 349 (1998) (on second appeal, the decision of the first appeal becomes the law of the case and is conclusive of every question of law or fact decided in the former appeal, and also of those which might have been, but were not decided.) Here, we stated that the only thing to be determined on remand was the value of the reversionary interests because "those reversionary interests were erroneously not considered in the distribution of the marital property." *Skokos*, 332 Ark. at 531. Because the value of the possessory interests had been determined, and was not an issue on remand, the trial court properly accepted those values during the second trial.

 As for the trial court's decision that Richard Stephens's testimony was "entitled to more weight and credibility than the other experts," that determination is well within the scope of the chancellor's discretion. As we noted earlier, we give due deference

to the chancellor's superior position to determine the credibility of witnesses and the weight to be given their testimony. *See Myrick v. Myrick*, 339 Ark. 1, 2 S.W.3d 60 (1999). Further, it is within the province of the trier of fact to determine the credibility of witnesses and resolve conflicting testimony. *Id*. In determining the value of the reversionary interests, Stephens, who has been a real estate appraiser since 1965, considered the value of the possessory interests, the gift tax returns that had been filed on the trusts, and the fact that the trusts could be terminated by the grantor. Although Theodore's expert did not take into consideration this power reserved to the grantor in his valuing the reversionary interests, the trial court found such power would be significant to a potential buyer. The trial court was engaged in an independent process of valuing the reversionary interests and was not bound to a mechanical application of the Internal Revenue Service Regulations, upon which Theodore's expert appeared to solely rely. The trial court found Stephens's approach the most reliable, and, as already mentioned, that kind of decision regarding the credibility of an expert witness is not one that this court will reverse on appeal absent a showing of abuse of discretion. Because it was not error for the trial court to accept, as an initial matter, the value of the possessory interests determined earlier, Theodore has not demonstrated that the court abused its discretion in accepting the figures of Stephens over those of Theodore's own expert. Therefore, we do not reverse the trial court on this point.

Finally, Theodore's second point on cross-appeal is that the Judge Hannah erred when he denied Theodore's request that Pamela's fair market value in the two cellular companies be decreased by a capital gains tax. In the original decree, Judge Gray wrote that "[t]o the extent possible, [Theodore's] payments to [Pamela] shall be in cash. If necessary, a portion of the payments may be made in stock or other assets readily convertible to cash. Each party shall be liable for one-half of any tax liability, a) that the minority partnership interests incurred as of the filing of this Decree, and b) that may result from [Theodore's] paying [Pamela] for her interests in the partnerships."

On this point, Theodore urges two subpoints: first, that the trial court on remand should have considered tax implications because the marital property was not equally divided, and second, that the first decree's direction that both parties were to be responsible for one-half of any tax liability is law of the case, since this portion of the original decree was not appealed. As to the first of these points, we reject Theodore's argument that the marital property was unequally divided, and therefore the court should have

taken tax consequences into account pursuant to Ark. Code Ann. § 9-12-315(a)(1)(A)(ix) (Repl. 1998). That statute reads in relevant part as follows:

(a) At the time a divorce decree is entered:

(1)(A) All marital property shall be distributed one-half (1/2) to each party unless the court finds such a division to be inequitable. In that event the court shall make some other division that the court deems equitable taking into consideration . . .

(ix) [t]he federal income tax consequences of the court's division of property.

It is Theodore's argument that the chancellor on remand found the marital property to be unequally divided and therefore should have, but failed to take tax consequences into account under Ark. Code Ann. § 9-12-315(a)(1)(A)(ix). We cannot agree. As we read the record, the chancellor initially indicated that the Skokoses would share the tax consequences, whatever the division of their property was. However, when he entered his order, the chancellor denied Theodore's request that Pamela's fair market value in the two cellular companies be decreased by a capital gains tax. Although the chancellor declined to require Pamela to share in the tax consequences, neither the court's findings nor its order reflect that the chancellor failed to consider such tax consequences; rather, they reflect only that he decided Pamela did not have to share in them.

Next, Theodore contends that Chancellor Gray's first decree found that each party would bear the tax consequences and such ruling became law of the case. The tax consequences for which each party was to have been responsible pertained to any liability that "may result from [Theodore's] paying [Pamela] for her interests in the partnerships." Theodore, however, did not sell any stock in either of the cellular companies in order to pay Pamela; any capital gains taxes which may have resulted from the sale of those companies would not have been incurred until years after the divorce. In fact, Theodore concedes that the capital gains tax was triggered by the sale of his stock after the parties' divorce. Because Theodore has not shown the capital gains taxes were incurred as a result of paying Pamela for her interests in the partnership, there was nothing for the court to consider.

Finally, Theodore makes no arguments in his brief as to precisely what the tax consequences were that the chancellor should

have considered. In the absence of any convincing argument on the subject, we cannot say that the trial court erred.

For the foregoing reasons, we affirm the trial judge on direct appeal and on cross-appeal.

Special Justices EDWARD MORGAN, DONALD DONNER, DAVID NIXON, and RANDY LANEY join in this opinion.

CORBIN, BROWN, IMBER, and HANNAH, JJ., not participating.