Kimberly ADAMETZ *v.* James ADAMETZ

CA 03-782                                        155 S.W.3d 695

Court of Appeals of Arkansas
Division II
Opinion delivered March 24, 2004

*Skokos, Bequette & Billingsley, P.A.*, by: *Keith I. Billingsley*, for appellant.

*Howell, Trice, Hope & Files, P.A.*, by: *William H. Trice*, for appellee.

SAM BIRD, Judge. Kimberly Adametz and James Adametz were divorced by a decree entered March 31, 2003. Kimberly appeals the portion of the decree pertaining to the distribution of the parties' marital assets and the amount of child support. She contends that the court erred: (1) by failing to award her half of appellee's 8.99% interest in Arkansas Surgical Hospital (ASH); (2) by deducting overhead expenses and 43% income taxes from her share of the accounts receivable of Neurological Surgery Associates, P.A. (NSA); and (3) in finding that she and James had not reached an agreement as to the amount of child support appellee was to pay. We do not agree with her first and third arguments, and we affirm as to those points. However, because we hold that the court erred in deducting the overhead expenses in valuing Kimberly's interest in the accounts receivable of NSA, we reverse and remand on the second point.

### Discussion of the Evidence

The parties, both medical doctors, married in 1990 when Kimberly was in her internship and residency, and two children were born to them. James was a practicing neurosurgeon with NSA when the parties married. The parties separated in September 2001, and Kimberly filed for divorce.

At the hearing, Kimberly testified that the parties had agreed that James would pay 21% of his "net income" as child support. Kimberly also testified that James had invested $10,000 in ASH without telling her. She stated that ASH had borrowed $2 million to finance the construction of a specialty hospital. She stated that James's interest in the ASH venture was marital property, and she requested that it be divided equally between them.

James testified that, at a conference in December 2002, the parties and their attorneys had discussed settlement of the child-support issue by agreeing that he pay 21% of his net income but that they had not agreed on sums to be deducted from James's gross income in order to determine the amount of his "net income." He recalled that both attorneys told him that he should pay 21% of his

net income as child support and that his attorney had indicated at the conference that James agreed. James also said that, because the parties had agreed to joint custody of the children, and because the children would spend equal time with each parent, he should not have to pay the full amount called for by the child-support chart. James's testimony was that the parties never agreed on the amount of his net income or a dollar amount that he was to pay in child support. He stated that his gross pay in 2002 was $379,191 and that he had deductions for federal, state, social security, and Medicare taxes of $161,776. He stated that his monthly take-home income was $18,117.

James also testified concerning his interest in ASH. He stated that he and several other doctors invested in a limited-liability company in order to purchase land to build a hospital in North Little Rock. He testified that he discussed his investment of $10,000 with his wife prior to making it. He said that ASH borrowed $2 million to purchase the land for between $1.2 million and $1.5 million and to pay for architects' fees and feasibility studies. He also said that he had made no payments on the loan, principal, or interest. James valued his interest in ASH as one-seventh of the value of the land, less the debt owed against it, which he said resulted in a net value of negative $50,000. He also stated that there had been an enormous amount of pressure from other hospitals "in town" to prevent the project from going forward and that several of the original investors and other potential investors had been "scared off" of the project for fear it would lose money and because of the pressure from other hospitals.

Mike Schaufele, a certified public accountant, testified that at the end of 2002 NSA had accounts receivable of $205,709.50 that resulted from James's efforts. He testified that, historically, the percentage of the practice's revenue that goes to pay overhead for NSA averaged 42.15% and that NSA had a historical collection rate of 44.46%. Schaufele said that after, deducting those percentages, the remainder would be paid to James as a bonus upon which he would have to pay income taxes.

Tracy Fox, a certified public accountant and Kimberly's expert, testified that he valued James's interest in NSA at $101,000. He valued James's interest in the "hard assets," such as plant and equipment, at $8,000. Fox testified that James had accounts receivable of $208,067 as of January 15, 2003, and that NSA had a

historic collection percentage of 44.46%. Fox testified that overhead was not a component of accounts receivable because no further expenditures would be necessary and that the receivables had already been discounted by the 44.46 collection percentage. Fox testified that James would have to pay taxes on the receivables when they were collected. Fox also stated that, although James had taxes withheld at the rate of 43%, he actually paid taxes in 2001 at the effective rate of 28%.

Rufus Wolff, an attorney for ASH, testified that James was one of seven original investors in ASH and that each original investor had contributed $13,000. Wolff said that James owned eight "units" in ASH, that each unit costs $5,000, and that he and the other original investors would have to contribute an additional $27,000 so that their investment would equal the amount contributed by investors who had come in since the original investors created ASH. Wolff testified that ASH had paid $1.5 million to purchase twenty-eight acres of land on which it intended to build a speciality hospital, that ASH had borrowed $2 million to finance the land purchase and have plans developed, and that James and the other six original investors had each signed a personal guaranty for 125% of their pro rata share of ASH. Wolff testified that James owned an 8.99% in ASH, that James would have to obtain the permission of the company before he could transfer any of his units, and that James's interest has no marketable value at the present time. Wolff said that Kimberly Adametz had not signed the ASH operating agreement and had not agreed to abide by the terms and conditions of the operating agreement.

Wolff said that construction of the hospital would not commence unless and until financing was obtained in the amount of approximately $18 million, and that each investor would have to be approved by the bank as a personal guarantor for their pro rata part of the loan. He stated that plans and copies of the pro forma statements submitted to the bank, which he admitted may not be accurate, included projected net annual income of $1.2 or $1.3 million and that any distributions would be made according to the percentage of ownership. Wolff stated that the bank was interested in making the $18 million loan for permanent financing for the project, the biggest hurdle facing the project. He also stated that ASH was worth what the land would sell for after repayment of the debt.

### The Trial Court's Decision

The trial court issued a letter opinion that awarded Kimberly $6,500, representing one-half of the $13,000 invested by James in ASH, but refused to assign any value to ASH itself, referring to the value of such a venture as "speculative."

The trial court found that James's share of NSA's accounts receivable was $205,000, which, by applying the 44.6% historical rate of collection, it reduced to $113,570. The court then further reduced the accounts by 42.15%, representing the historical rate of NSA's overhead expenses, arriving at $65,700 as the pre-tax value of the accounts. The court then reduced the $65,700 by 43%, which it found to be James's income tax bracket, arriving at an after-tax value for the accounts of $37,449, one-half of which ($18,724) it awarded to Kimberly for her share of James's accounts receivable at NSA.

The court found that the parties had not reached an agreement that James would pay 21% of his net income as child support, but had agreed only that the provisions of the child support chart in Administrative Order No. 10 should apply. The trial court based James's child-support obligation on a monthly net income of $19,615, which was computed by deducting taxes and insurance premiums from his 2002 gross income of $451,390 and dividing by twelve. The trial court then deviated from the child-support chart amount, finding that the parties would have equal time with the children, and set James's monthly support obligation at $3,400.

### Points on Appeal

For Kimberly's first point on appeal, she contends that the trial court erred with respect to its valuation of James's interest in ASH. On appeal, equity cases, such as divorces, are reviewed *de novo*. *Skokos v. Skokos*, 344 Ark. 420, 40 S.W.3d 768 (2001). With respect to the property issues in a divorce case, we review the trial judge's findings of fact and affirm them unless they are clearly erroneous. *Id.* A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed. *Huffman v. Fisher*, 343 Ark. 737, 38 S.W.3d 327 (2001). In order to demonstrate that the trial court's ruling was erroneous, an appellant must show that the trial court abused its discretion by making a decision that was arbitrary or groundless. *Skokos v. Skokos, supra*.

The trial court awarded Kimberly $6,500 for her interest in the funds James invested in ASH, but the court did not award her any interest in the ASH venture. The trial court ruled that assigning any value to ASH would be speculative due to the fact that ASH was not in business and, at the time of the hearing, no certainty existed that the venture would proceed.

■ There is a presumption that all property acquired during a marriage is marital property. *McDermott v. McDermott*, 336 Ark. 557, 986 S.W.2d 843 (1999). Kimberly relies on *McDermott*, where the court determined that attorney's fees earned pursuant to a contingency fee contract made during the marriage were marital property even though the fees were not collected until some time in the future. In *McDermott*, the husband's contingency contracts were created during the marriage and some of the cases covered by those contracts were tried during the marriage. Therefore, the husband expended time and effort during the marriage in an effort to create more marital assets.

■ We find *McDermott* distinguishable from the case at bar. The court's findings on this point are not clearly erroneous. The trial court found that ASH has only a speculative value as a going concern because it had no operational history and had no goodwill to be valued. Arkansas Code Annotated section 9-12-315 (Repl. 2002) requires the use of the "fair market value" standard for valuing businesses in a marital-property context. *See Cole v. Cole*, 82 Ark. App. 47, 110 S.W.3d 310 (2003). However, ASH does have value because it owns a significant asset — the real estate. James Adametz and Rufus Wolff both recognized this when they valued James's interest in ASH as one-seventh of the value of the land less the debt owed against it. Kimberly failed to provide evidence as to the current value of the land, and it was her burden to do so. *See Wilson v. Wilson*, 294 Ark. 194, 741 S.W.2d 640. (1987).

■ For Kimberly's second point on appeal, she challenges the trial court's valuation of James's interest in NSA. The trial court accepted the testimony of James's expert that the gross value of the receivables were $205,000, but then the court applied deductions for overhead and for James's income tax rate in arriving at the net value of the accounts receivable of $37,449. Kimberly argues that this method of calculation was in error. The parties have not cited, nor has our own research found, any Arkansas cases

that specifically address whether accounts receivable should be reduced by an allowance for overhead in arriving at the net value of the receivables. The supreme court alluded to the problem but expressly declined to address it in *Meeks v. Meeks*, 290 Ark. 563, 721 S.W.2d 653 (1986). However, the Arizona Supreme Court has specifically addressed the issue of whether future overhead expenses should be considered in the valuation of a business in a divorce case. *In re Marriage of Goldstein*, 120 Ariz. 23, 583 P.2d 1343 (1978). In *Goldstein*, the husband's interest in his medical practice was at issue. The Arizona Supreme Court held that the trial court correctly did not deduct an overhead allowance for either the corporation's checking account or the accounts receivable. The court reasoned that:

> Since the trial court must establish a *present* value for each asset in order to make an equitable distribution, it properly is not concerned with possible future debts which may or may not come into existence.... The overhead incurred in generating the balance currently in the checking account and accounts receivable has either been paid, thereby reducing the checking account, or is present in the form of an incurred debt. In either case, the past overhead which generated these assets would be reflected in the present value of the corporation. To then subtract future overhead expenses would amount, in essence, to a double deduction from the same assets.

*Goldstein*, 583 P.2d at 1344-45 (citation omitted) (emphasis in original); *see also Peterson v. Peterson*, 367 N.W.2d 90 (Minn. Ct. App. 1985) (following *Goldstein*); *Lewis v. Lewis*, 106 N.M. 105, 739 P.2d 974 (Ct. App. 1987). We adopt the reasoning of these cases and conclude that the trial court erred in deducting the overhead expenses in valuing the accounts receivable.

■ Kimberly also argues that the trial court erred in reducing the value of the receivables by James's tax rate. A trial judge may consider "the federal income tax consequences of the court's division of property" when he finds it would be inequitable to divide the property in half. Ark. Code Ann. § 9-12-315(a)(1)(A)(ix) (Repl. 2002). In this case, James will be required to pay income taxes on the receivables when he actually receives them. Therefore, we find the court's ruling was correct when it required that Kimberly's share of the receivables be reduced by the percentage of James's income taxes. However, we note that

Kimberly's expert, Tracy Fox, testified that, although James had taxes withheld from his income at the rate of 43%, he actually paid income taxes at the rate of only 28%, resulting in Kimberly's share of the receivables bearing a greater portion of the income tax burden than James's share. Because we find that income taxes should be deducted from Kimberly's share of the accounts receivable at the rate actually paid by James, rather than the 43% rate used by the trial court, we reverse and remand for further proceedings on this point.

■ For her third point on appeal, Kimberly contends that the trial court erred in refusing to enforce the alleged December 19, 2002, agreement on child support as part of the divorce decree. On appeal our review of a trial court's order of child support is *de novo*, and we will affirm the trial court unless its findings of fact are clearly erroneous. *Alfano v. Alfano*, 77 Ark. App. 62, 72 S.W.3d 104 (2002). A finding is clearly erroneous, even though there is evidence to support it, if the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Deluca v. Stapleton*, 79 Ark. App. 138, 84 S.W.3d 892 (2002). In resolving the question of whether the trial court's findings are clearly erroneous, we must give due regard to the opportunity of the trial court to judge the credibility of witnesses. *Johnson v. Arkansas Dep't of Human Servs.*, 78 Ark. App. 112, 82 S.W.3d 183 (2002).

■■ Kimberly argues that the trial court erred in finding that the parties did not make an agreement that James would pay as child support 21% of his net income. The trial court found that the parties had not agreed on all of the terms and therefore did not reach an agreement as to child support. In her testimony, Kimberly admits that the parties had agreed on the 21% figure but had not agreed on the proper deductions in order to arrive at James's "net income." As this court recently stated:

> Before an agreement becomes binding there must be a meeting of the minds of both parties as to *all* terms. A meeting of the minds is defined as an agreement reached by the parties to the contract and expressed therein, or as the equivalent of mutual assent and mutual obligation.

*Development & Constr. Mgmt., Inc. v. City of North Little Rock*, 83 Ark. App. 165, 173, 119 S.W.3d 77, 83 (2003) (emphasis added) (citations

omitted). Here, we find that the court's ruling that there was no agreement to be correct. No meeting of the minds existed on the deductions necessary to arrive at James's "net income," a necessary component because that is the amount to which the 21% figure will be applied to arrive at the amount of child support James pays.

▮ Furthermore, it is also irrelevant whether the parties reached an agreement because, as we recently noted in *Harris v. Harris*, 82 Ark. App. 321, 107 S.W.3d 897 (2003), such independent contracts are not binding on the trial court, and the trial court always retains jurisdiction over child-support issues as a matter of public policy. No matter what the parties' independent contract provides, either party had a right to request a modification of a child-support award. *See also Alfano*, *supra*. Accordingly, we affirm the trial court on this point.

Affirmed in part; reversed and remanded in part.

STROUD, C.J., and VAUGHT, J., agree.